**STORAGE TECHNOLOGY CORPORATION**

v.

**The TRUST COMPANY OF NEW JERSEY, Appellant.**

No. 87–5416.

United States Court of Appeals, Third Circuit.

Argued Jan. 5, 1988.

Decided March 15, 1988.

Robert E. Margulies (argued), Clifford A. Herrington, Margulies, Wind, Herrington & Katz, Jersey City, N.J., for appellant.

Peter A. Jaffe (argued), Jaffe & Asher, New York City, for appellee.

Before SEITZ, HUTCHINSON, and ROSENN, Circuit Judges.

### OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal derives from an inartfully drawn provision in an agreement between two sophisticated corporations for the lease of peripheral computer equipment. The plaintiff-lessor, Storage Technology Corporation (STC), complaining that the defendant-lessee, The Trust Company of New Jersey (N.J. Trust), had defaulted on the lease, filed a diversity action in the United States District Court for the District of New Jersey seeking to enforce the terms of the agreement. After the filing of an answer and a counterclaim, the case was tried to the court. The court entered judgment for the plaintiff together with attorney's fees, costs, and other expenses aggregating $107,585.66, and dismissed N.J. Trust's counterclaim. The defendant appeals and we affirm.

### I.

STC, a Delaware corporation with its principal place of business in Louisville, Colorado, is engaged in the design, manufacture, and marketing of high perform-

ance peripheral computer equipment such as tape drives, tape controllers, and related devices. These peripherals are commonly used in connection with the operation of commercial computers produced by major computer manufacturing companies.

On December 28, 1978, N.J. Trust, a New Jersey banking corporation with its principal place of business in Jersey City, leased equipment from STC for use with its Burroughs B 3900 computer system. When the lease agreement expired on December 29, 1982, the parties entered into a forty-eight month renewal lease effective December 30, 1982. This lease, which forms the basis of the present litigation, provided for the rental and maintenance of more modern peripheral equipment for use with the Burroughs B 4800 computer system acquired by N.J. Trust in 1979.

In December 1984, N.J. Trust unilaterally decided to upgrade its computer system and purchase two Burroughs Series B 4925 computers. Invoking paragraph 17 of the renewal lease, N.J. Trust requested STC, in December 1984, to make necessary upgrades in the tape controller and interface in order to render the peripheral equipment compatible with the new computers. Paragraph 17 provided:

> Upon the Customer's written request, STC will make field installable model upgrades and feature additions to units during their Rental Terms. A model upgrade is defined as a model change in like devices which results in an increase in the Monthly Rental Payments.

STC, however, had an outstanding agreement with Burroughs (the OEM agreement) which provided in paragraph 24:

> STC agrees not to sell to others or license others to manufacture Controllers designed for Burroughs under this Agreement or any other product with unique Burroughs interface specifications as described in attachment "B" unless Burroughs grants its specific written consent thereto.

Prior to N.J. Trust's purchase of the B 4925 computers, Burroughs informed it that the existing STC peripherals would be incompatible with the new system. Moreover, Burroughs stated that the OEM agreement precluded STC from selling or leasing the peripherals to N.J. Trust without Burroughs' written consent.

On January 11, 1985, N.J. Trust again wrote STC requesting that it make the necessary model upgrades. STC, however, replied that the OEM agreement barred it from complying with defendant's request. As a consequence, N.J. Trust found itself compelled to buy the compatible peripherals from Burroughs on February 21, 1985, at a cost of $318,974. On June 19, 1985, N.J. Trust terminated the lease with STC and requested it to remove its peripherals from defendant's computer center. STC, however, did not remove the system until six months later and, in the meantime, N.J. Trust was compelled to store the disconnected equipment in 270 square feet of its valuable computer space.

## II.

### A.

The primary issue raised on appeal by N.J. Trust pertains to the interpretation of paragraph 17's model upgrade provision. Defendant contends that the provision required STC to "substitute one piece of computer equipment for another." Moreover, N.J. Trust observes that STC had always updated defendant's main frame computer system by leasing any necessary upgrade equipment. Thus, N.J. Trust concludes that STC's failure to provide the compatible peripherals constituted a material breach of the plain and unambiguous terms of the lease agreement. Defendant adds that STC's breach excused N.J. Trust from making further rental payments under the lease. We disagree.

At trial, the parties introduced extrinsic evidence in support of their respective interpretations of the phrase "field installable model upgrades." The district court rejected defendant's definition, noting that it would render the concept meaningless by making *all* peripheral equipment field in-

stallable.[1] Instead, the court found as a fact, relying on extrinsic expert testimony, that:

> [A] field installable upgrade means an upgrade to an existing piece of equipment which can be effected by a field engineer by the use of a kit, change of a circuit board, or similar modification to change a feature of a piece of equipment then at a customer's site.... [N]ew equipment from the factory or equipment which would have to be moved from a customer's site, and returned to the factory would not fit within the definition of a "field installable model upgrade."

### B.

■ Contrary to N.J. Trust's assertion, we conclude that the language of the disputed clause is not plain and unambiguous. Defendant's effort to characterize the language as clear and subject to plenary review thus finds no support in this record. Inasmuch as extrinsic evidence was necessary for the interpretation of the clause, the trial court's determination of the meaning of the language was one of fact. *See Anthony L. Petters Diner, Inc. v. Stellakis*, 202 N.J.Super. 11, 493 A.2d 1261, 1270 (1985); *Michaels v. Brookchester, Inc.*, 26 N.J. 379, 387, 140 A.2d 199, 204 (1958). We must accept the district court's factual findings unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Universal Minerals, Inc. v. C.A. Hughes & Company*, 669 F.2d 98, 102 (3d Cir.1981). Because the district court's factual finding regarding the meaning of the disputed phrase is supported by the record, we conclude that it was not clearly erroneous. STC's expert witness testified that the term refers to an upgrade that can be installed at the *customer's site* with the use of a manufacturer's upgrade kit in order to increase the effectiveness of an existing unit. Moreover, he explicitly stated that the leased STC peripherals could not be converted at N.J. Trust's site to render them compatible with the new Burroughs computers.

■ N.J. Trust next argues that while the OEM agreement prohibited STC from selling or licensing the Burroughs peripherals, the agreement nonetheless implicitly permitted STC to *lease* the necessary equipment. Defendant concludes that STC was therefore compelled to make the necessary upgrades. The contention is meritless. By its very terms, the 1982 lease obligated STC to lease only its own equipment, and not equipment owned exclusively by others. The district court found that paragraph 17 of the 1982 lease referred to the upgrading of an STC product, and not to a peripheral owned absolutely and in its entirety by Burroughs. Additionally, the court observed that the 1982 lease never contemplated that STC would upgrade "equipment which [it] neither owned, nor controlled, nor [which was] accessible to it." We conclude that this finding of fact is not clearly erroneous.

### III.

N.J. Trust also contends, relying upon *Restatement of Contracts Second* § 350, that STC had a duty to mitigate damages by promptly retrieving and reletting the leased equipment. *See McDonald v. Mianecki*, 79 N.J. 275, 398 A.2d 1283, 1295 (1979). The district court rejected this argument relying upon the "lost volume seller" theory of damages:[2]

---

1. The defendant submits that New Jersey law applies to this action, a claim which STC does not dispute. N.J.Trust's principal place of business was in New Jersey, the peripherals were leased in and used in New Jersey, and all additional significant contacts were in New Jersey. We therefore apply New Jersey law.

2. *See Locks v. Wade*, 36 N.J.Super. 128, 114 A.2d 875 (1955). The term "lost volume seller" has received widespread recognition since Professor Robert J. Harris's article, *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared*, 18 Stan.L. Rev. 66 (1965). The theory, however, was earlier expounded in *Locks, supra*. A lost volume seller is one who upon a buyer's breach of contract, resells the article to a second purchaser at the price agreed to by the first purchaser. The second purchaser, however, would have purchased a similar article notwithstanding the first purchaser's breach. Under such circumstances, when the seller resells the article, he is still not made whole because "he will have lost one sale, one profit, over the course of the year." J. White & R. Summers, *Uniform Commercial Code* at 275 (West Pub.1972). *See Fa-*

To suggest that merely to release the equipment ... would mitigate damages misses the obvious point that the new party to the agreement of lease for the equipment should have been an additional lease customer thereby providing additional profits to STC, not a substitute for a breaching party such as Trust Company.

N.J. Trust argues that the district court's holding was erroneous based upon STC's failure to prove that it was a lost volume seller.

The lost volume seller theory is a response to a breaching buyer's right to have a non-breaching seller mitigate damages. In other words, a seller can avoid the effect of its failure to mitigate by proving that it was a lost volume seller. However, before we can decide whether STC was a lost volume seller, we must determine which party had the burden of proving mitigation of damages.

■ "Mitigation of damages is a doctrine applicable to breach of contract cases ... and defendant sustains the burden of proof ... as to actual or potential mitigation and the amount thereof." *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 358 A.2d 805, 815 (1976). Stated another way, the burden of proving that losses could have been reduced or avoided "is always upon the party who has broken the contract." *Banco di Roma v. Fidelity Union Trust Co.*, 464 F.Supp. 817, 826–27 (D.N.J.1979).

Defendant argues that it met its burden of proof when, on cross-examination of Michael Fedorchko, STC's marketing representative, it inquired about the eventual disposition of the retrieved peripherals and he replied, "I don't know." As marketing agent, Fedorchko was only competent to testify regarding the leasing arrangements and the lack of compatibility between the leased peripherals and the new computers. His lack of knowledge concerning the retrieved equipment was therefore insufficient to establish STC's failure to mitigate

damages. At oral argument in this court, the plaintiff asserted that information concerning the equipment's disposition was readily available on discovery from numerous STC employees, but that defendant had failed to avail itself of these opportunities. N.J. Trust offered no proof whatsoever that STC actually had, or could have, sold or leased the retrieved equipment. Thus, because N.J. Trust failed to meet its burden of establishing a failure to mitigate damages, we need not reach the question of whether STC was a lost volume seller.

The district court found that N.J. Trust owed STC $81,665.32 under the lease, inclusive of maintenance and removal charges. This sum, except for defendant's contention that it should have been reduced by virtue of STC's responsibility to mitigate damages, is not challenged and we therefore affirm it.

### IV.

■ Finally, defendant challenges the district court's award of attorney's fees pursuant to the lease agreement between the parties which provided that the "customer shall be liable for reasonable attorney's fees and other costs and expenses resulting from any default, or the exercise of [plaintiff's] remedies." Plaintiff's counsel submitted an affidavit and documents in support of legal fees and costs in the amount of $25,920.34. Because STC was in bankruptcy, the district court found that plaintiff's counsel discounted its bill to an amount below its normal rate. The district court found the fees actually charged to be reasonable.

Defendant observes that the fee awarded in the present case represented one-third of the judgment. In arguing that this amount was excessive, N.J. Trust notes that an award consisting of 15 or 20 percent of the judgment would comply with common commercial practice and the terms of the lease agreement. Additionally, N.J. Trust contends that the time expended by counsel

*mous Knitwear Corp. v. Drug Fair, Inc.,* 493 F.2d 251, 254 n. 5 (4th Cir.1974); *Teradyne Inc. v. Teledyne Industries, Inc.,* 676 F.2d 865, 868 (1st

Cir.1982); see also Restatement on Contracts 2d, § 347, comment f.

and the absence of any complex legal questions in the present action further mandate a reduction of the award.

Our standard of review is whether the district court abused its discretion. *Pawlak v. Greenawalt*, 713 F.2d 972, 977 (3d Cir.1983). New Jersey law provides us with the criteria to be considered by a district court in determining a reasonable fee:

> (1) The importance of the dispute or jeopardy as to which professional services were made necessary; (2) the nature and extent of the jeopardy or risk involved or incurred; (3) the nature, extent and difficulty of the services rendered; (4) the experience and legal knowledge required, and the skill, diligence, ability and judgment shown; (5) the time necessarily spent by the attorney in the performance of his services; (6) the results obtained; (7) the benefits or advantages resulting and their importance; (8) any special circumstance, including the standing of the attorney for integrity and skill; and (9) the overhead expense to which the attorney has been put.

*Westinghouse Electric Corp. v. Local No. 449*, 39 N.J.Super. 438, 121 A.2d 53, 62 (1956). *See also Westfield Centre Service, Inc. v. Cities Service Oil Company*, 162 N.J.Super. 114, 392 A.2d 243, 251 (1978), *aff'd*, 172 N.J.Super. 196, 411 A.2d 714 (1980), *aff'd*, 86 N.J. 453, 432 A.2d 48 (1981).

The court reviewed plaintiff's counsel's documents in support of the claim for fees and costs, the nature of the litigation, including defendant's counterclaim, the time spent over a seventeen month period, the hourly rates charged, and the final bill as discounted. We too have reviewed the record and the documents in support of the claim and, although the bill may be high, we cannot say, under the circumstances, that the district court abused its discretion.

The plaintiff has requested that in the event it is the prevailing party, that it also be awarded reasonable attorney's fees for the appeal. This additional claim will be remanded to the district court for consideration.

## V.

Accordingly, the judgment of the district court will be affirmed in all respects. STC's claim for reasonable attorney's fees on this appeal will be remanded to the district court. Costs taxed to the appellant.