A91A0491, A91A0492. UNIQUE DESIGNS, INC. v. PITTARD MACHINERY COMPANY; and vice versa.
(409 SE2d 241)

COOPER, Judge.

In January or February of 1988, Pittard Machinery Company ("Pittard"), a distributor of lathes, attempted to sell to Unique Designs, Inc. ("Unique") a "Mori Seiki" lathe; however, Unique instead purchased a less expensive "Mazak" lathe from one of Pittard's competitors. In June of 1988, Unique contacted Pittard and requested

Pittard's assistance in disposing of the Mazak lathe because it had turned out to be incompatible with Unique's business. During the course of this conversation, Unique indicated that in return for Pittard's assistance in disposing of the Mazak lathe, Unique would replace the Mazak lathe by purchasing a Mori Seiki lathe from Pittard. Pittard proceeded to arrange for the resale of the Mazak lathe by putting Unique in contact with an international broker of machinery who quickly found a purchaser for the used lathe. Pittard never asked Unique to pay a commission on the sale of the Mazak lathe because of its expectation that Unique would be replacing the Mazak lathe with a Mori Seiki lathe purchased from Pittard. Thereafter, Unique and Pittard commenced negotiating the price of the Mori Seiki lathe and during the course of a telephone conversation, the parties finally agreed upon a price of either $104,000 or $104,850, and arrangements were made for the delivery of a lathe to Unique. It is undisputed that an oral agreement to purchase the lathe was made, although the amount of the purchase price is in dispute.

The day after the agreement was reached, Unique contacted Pittard and cancelled its order to purchase the lathe. Apparently, Unique had been negotiating all along with one of Pittard's competitors and had used its contract with Pittard as leverage to secure a reduced price on a different model lathe with the competitor. Shortly after Unique's repudiation of the contract, Pittard was able to resell the Mori Seiki lathe to one of its regular customers, Sieco, Inc. ("Sieco"), for $110,000.

Pittard brought suit against Unique seeking general damages and attorney fees for Unique's breach of its agreement to purchase the lathe. The trial court granted Pittard's motion for summary judgment on the issue of liability, ruling that the oral contract between the parties was valid pursuant to OCGA § 11-2-201 (3) (b), and Pittard was a "high volume dealer," entitled to recover its lost profits pursuant to OCGA § 11-2-708 (2), without having to offset the proceeds it received from the sale of the lathe to Sieco. The case proceeded to trial on the issue of damages, and the jury awarded Pittard $18,000 in general damages and $18,000 in attorney fees. Following the jury verdict, the trial court entered judgment in favor of Pittard for $18,000 in general damages but set aside the jury's award of attorney fees. Unique appeals from the trial court's grant of partial summary judgment to Pittard and the final judgment entered on the jury verdict for general damages (Case No. A91A0491). Pittard cross-appeals from the trial court's order setting aside the jury's award of attorney fees (Case No. A91A0492).

## Case No. A91A0491

1. Unique contends in enumerations 1, 2, 3, 4, 9, 10 and 11 that the trial court erred in adopting the "lost volume dealer" rule, which allowed Pittard to recover its lost profits on the repudiated contract without offset for the proceeds received from the resale of the lathe to Sieco.

Both Pittard and Unique appear to be in agreement that OCGA § 11-2-708 (2) sets forth the proper measure of damages in circumstances such as those presented by this appeal. Although there are no Georgia cases directly on point, this court has held that "[i]f the measure of damages under [OCGA § 11-2-708 (1)] is inadequate to put the seller in as good a position as if the contract had been fully performed, then the damages are as prescribed by (2). [Cits.]" *Franklin v. Demico, Inc.*, 179 Ga. App. 775 (1) (347 SE2d 718) (1986). Numerous authoritative writers and other jurisdictions agree that UCC § 2-708 (2) (OCGA § 11-2-708 (2)) is applicable under the present circumstances. See White & Summers, Uniform Commercial Code, § 7-9 (1988) (fn. 4). It is also the opinion of these authorities that the statutory history of the Uniform Commercial Code indicates that UCC § 2-708 (2) was intended to provide an adequate remedy for the "lost volume dealer." "Lost volume dealer," sometimes referred to as a "lost volume seller," refers to a seller who due to the nature of its business, is damaged by a buyer's breach to the extent that it loses the entire profit from the sale.

"When the seller is a dealer he is entitled to recover lost profits and incidental damages from a repudiating buyer, even though the seller has resold the goods to another buyer at the same price as the original buyer had contracted to pay, for the reason that if the original buyer had not repudiated, the seller would have been able to make two sales and thus obtain two profits.

"The rationale for the rule for measuring damages in the case of a seller who is a middleman is that the breach by his buyer does not make possible a new sale which the seller could not have otherwise made in which new sale the profit lost upon the sale to the original buyer will be replaced; but rather, results in an irretrievable loss of profits." 4 Anderson, UCC, § 2-708:21 (1983).

In order for a seller to establish that he is a "lost volume dealer," he must prove that even though he later resold the repudiated contract goods, the sale to the third party would have been made regardless of the buyer's breach so that the seller would have realized two profits from two sales. "The key inquiry is the sellers' ability to provide the product to both the breaching buyer and the resale buyer." *Ragen Corp. v. Kearney & Trecker Corp.*, 912 F2d 619, 627 (3rd Cir. 1990). See also *National Controls v. Commodore Business Machines,*

209 Cal.Rptr. 636, 643 (1985); *Teradyne, Inc. v. Teledyne Indus.*, 676 F2d 865 (1st Cir. 1982); *Snyder v. Herbert Greenbaum & Assoc.*, 380 A2d 618, 624 (1977).

In the case sub judice, the record reveals that Pittard carries a large inventory of lathes; that the lathe to be delivered to Unique was a stock inventory item not specially ordered, made or adapted to any specifications on Unique's part; and that the sale of the Mori Seiki lathe to Sieco would have occurred even if Unique had not repudiated its contract. Thus, Pittard has clearly established itself as a "lost volume dealer," entitled to recover its lost profits pursuant to OCGA § 11-2-708 (2).

OCGA § 11-2-708 (2) provides: "If the measure of damages provided in subsection (1) of this Code section is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (Code section 11-2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." Unique argues that the formula provided for in this code provision should be strictly applied so that Pittard should be required to give Unique due credit for the payments or proceeds from the resale of the lathe to Sieco. However, the overwhelming view of modern authority has concluded that the formula, if strictly applied, will not yield the correct recovery that a "lost volume dealer" deserves. See White & Summers, supra, § 7-13 (fn. 3). As the court in *Snyder v. Herbert Greenbaum & Assoc.*, supra, stated at p. 625: "Logically, lost volume status, which entitles the seller to the § 2-708 (2) formula rather than the formula found in § 2-708 (1), is inconsistent with a credit for the proceeds of resale. The whole concept of lost volume status is that the sale of the goods to the resale purchaser could have been made with other goods had there been no breach. In essence, the original sale and the second sale are independent events, becoming related only after breach, as the original sale goods are applied to the second sale. To require a credit for the proceeds of resale is to deny the essential element that entitles the lost volume seller to § 2-708 (2) in the first place — the mutual independence of the contract and the resale.

"Practically, if the 'due credit' clause is applied to the lost volume seller, his measure of damages is no different from his recovery under § 2-708 (1). Under § 2-708 (1) he recovers the contract/market differential and the profit he makes on resale. If the 'due credit' provision is applied, the seller recovers only the profit he makes on resale plus the difference between the resale price and the contract price, an almost identical measure to § 2-708 (1). If the 'due credit' clause is applied to the lost volume seller, the damage measure of 'lost profits'

is rendered nugatory, and he is not put in as good a position as if there had been performance."

" ' "(T)he cardinal rule to guide the construction of laws is, first, to ascertain the . . . intent and purpose in enacting (them), and then to give (them) that construction which will effectuate the intent and purpose." [Cits.]' [Cit.]" *American Med. Intl. v. Charter Lake Hosp.*, 186 Ga. App. 204 (2) (366 SE2d 795) (1988). OCGA § 11-1-106 (1) provides that "[t]he remedies provided by [the Uniform Commercial Code] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed. . . ." The adoption of the "lost volume dealer" rule is consistent with the intent and purpose of the Uniform Commercial Code — to fairly compensate "lost profit dealers" so that they will be put in as good a position as if the other party had fully performed. Since Pittard clearly established that it was a "lost volume dealer," the trial court was correct to allow Pittard to recover its lost profits on its contract with Unique without having to offset profits it received on the resale to Sieco. Accordingly, appellant's enumerations 1, 2, 3, 4, 9, 10 and 11 are without merit.

2. (a) In enumeration 7, Unique contends that the trial court erred in allowing Pittard's claim for attorney fees to go to the jury. "Questions of bad faith, stubborn litigiousness and expense, OCGA § 13-6-11, are generally questions for the jury. [Cit.]" *Gorin v. FPA 2, P.C.*, 184 Ga. App. 239, 241 (361 SE2d 193) (1987). " '(T)he elements of bad faith which will authorize expenses of litigation in an ex contractu action are those acts relative to the conduct of entering into a contract or to the transaction and dealings out of which the cause of action arose, [cits.], but do not have reference to the motive with which the defendant defends an action after a cause of action has occurred. (Cit.) . . . We construe "transactions and dealings out of which the cause of action arose" to mean not only the negotiation and formulation of the contract, but also included is the performance of the contractual provisions.' [Cit.]" *St. Holmes v. St. Holmes*, 169 Ga. App. 283 (2) (312 SE2d 370) (1983). In the case sub judice, there was evidence from which a jury could have concluded that Unique procured Pittard's assistance in selling the Mazak lathe without ever intending to fulfill its promise to replace it with a lathe purchased from Pittard. Additionally, the jury could have concluded that Unique entered into the agreement with Pittard to acquire the lathe solely to use the agreement as leverage to lower the price being quoted by one of Pittard's competitors. Accordingly, the trial court did not err in allowing Pittard's claim for attorney fees to go to the jury. See *Beall v. F. H. H. Constr.*, 193 Ga. App. 544 (5) (388 SE2d 342) (1989).

(b) In enumeration 8, Unique argues that the trial court's charges to the jury on bad faith and allowance of attorney fees were incorrect

and that the trial court's decision to recharge the jury on bad faith three times without a proper definition of bad faith was prejudicial error. The transcript reveals that after the jury had begun its deliberations, the jury twice requested that the trial court recharge the jury on bad faith and allowance of attorney fees. The trial court complied with the jury's request, recharging the jury with the same charges on bad faith and attorney fees previously given, along with a reminder that the jury should not take the recharges out of context or give them undue weight. After both counsel objected to the content of the trial court's recharge on the grounds that the charges failed to provide the jury with an adequate definition of bad faith, the trial court offered both counsel an opportunity to provide new jury charges. The next morning, after reviewing both counsel's proposed charges on bad faith, the trial court decided to let the jury determine on its own what constitutes "bad faith." Neither attorney nor the court were aware of OCGA § 11-2-103 (1) (b) which defines good faith in the case of merchants as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," which by implication, would have provided a definition of bad faith.

A request to charge should in itself be correct and even perfect, otherwise the refusal to give it will not be cause for a new trial. See *Annis v. Tomberlin &c. Assoc.*, 195 Ga. App. 27 (7) (392 SE2d 717) (1990). Since Unique has conceded that the request to charge it submitted at trial was not correct, the refusal of the trial court to so charge was not reversible error. Moreover, we find that the charges given by the trial court were correct statements of the law and provided the jury with a sufficient basis to decide whether Unique's actions in this transaction were in bad faith. " 'Instructions which, when the jury is given credit for ordinary intelligence, are not confusing and prejudicial, are not reversible error.' [Cit.]" *Smaha v. Moore*, 193 Ga. App. 23, 24 (387 SE2d 13) (1989).

We also reject Unique's argument that the multiple recharges to the jury on the issue of bad faith constituted prejudicial error. Where the trial court cautions a jury before recharging upon a particular phase of a case that the recharge should not be considered with any emphasis, it is not error for the court to recharge the jury only upon the point or points requested. *Brown v. Nixon*, 231 Ga. 619 (2) (203 SE2d 200) (1974).

3. In enumerations 5, 6, 10, and 11, Unique argues that although the trial court in his grant of partial summary judgment to Pittard ruled that an oral contract to purchase the lathe existed, Unique was still entitled to present evidence to show that the oral contract was unenforceable because there had been no meeting of the minds. Relying on OCGA §§ 13-3-1 and 13-3-2, Unique argues that because certain essential terms of the agreement were in dispute — the purchase

price of the lathe, the accessory packages to be included in the sale, the amount of the downpayment and the financing arrangements — the contract was rendered unenforceable. We disagree. "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." OCGA § 11-2-204. The record clearly indicates that Unique intended to purchase a "Mori Seiki" lathe from Pittard for either $104,000 or $104,850. The confusion over the purchase price and the open terms in the agreement were not sufficient to negate the clear intent of the parties to enter into an enforceable agreement.

Unique also attempted to admit into evidence testimony and documentary evidence pertaining to a transaction between Unique and Pittard that occurred two years earlier, also involving Unique's purchase of a lathe from Pittard. Unique contends that the document evidencing the prior transaction, which consisted of ten pages containing a description of the accessory package to be included in the sale, as well as downpayment and financing terms, should have been admissible as evidence of a course of dealing between the parties in accordance with the provisions of OCGA § 11-1-205 (1). It is Unique's argument that this course of dealing between the parties would have established that there had been no meeting of the minds in the present transaction because certain key terms that had been described in great detail in the prior transaction had not been discussed or agreed upon in the present transaction.

"A course of dealing is a *sequence of previous conduct* between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." OCGA § 11-1-205 (1). (Emphasis supplied.) " 'It is a fundamental rule of statutory construction that where the language of a statute is plain and unambiguous, the terms used therein should be given their common and ordinary meaning. [Cits.]' " *Sledge v. Employees' Retirement System*, 196 Ga. App. 597, 598 (396 SE2d 550) (1990). We can only conclude under the plain and unambiguous language of this statute that a sale of a single lathe from Pittard to Unique, which occurred more than two years prior to the transaction at issue in this action, cannot be deemed to be a "sequence of previous conduct" under OCGA § 11-1-205 (1). Thus, the trial court did not err in refusing to allow evidence of the previous transaction at trial.

4. In enumeration 12, Unique contends that the trial court erred in refusing to allow Unique the right to cross-examine Pittard's witnesses as to the amount of commission which would have been paid by Pittard to its salesman from the sale of the lathe to Unique and in refusing to charge the jury that the commission was a direct cost of

the sale that should have been deducted from the jury's award. The correct measure of damages under OCGA § 11-2-708 (2), "is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer. . . ." This court has held that profit is determined by "subtracting from the contract price the amount which full performance would have cost the [seller]." *Franklin v. Demico, Inc.*, supra at 778. Other jurisdictions have interpreted this provision to require that "one need only subtract direct costs from the contract price." *Automated Med. Labs. v. Armour Pharmaceutical Co.*, 629 F2d 1118, 1125 (5th Cir. 1980). Unique argues that the definition of "direct costs" would of necessity have included the sales commission that would have been paid by Pittard to its salesperson, such that this amount should have been deducted from the profits awarded to Pittard. We disagree. As previously stated in Division 1 of this opinion, OCGA § 11-1-106 (1) states: "The remedies provided by [the Uniform Commercial Code] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed. . . ." See, e.g., *Bennett v. Assoc. Food Stores*, 118 Ga. App. 711 (2) (165 SE2d 581) (1968). If Unique had fully performed under the contract, Pittard would have received $18,000 profit from the sale and would have had funds available to pay its salesperson the compensation owed him as a result of this sale. Requiring Pittard's award to be reduced by an amount equal to the commission that Pittard may have intended to pay its salesperson subsequent to this sale or by the amount of any other liability which Pittard may have been obligated to satisfy from the profits received from this sale, i.e. income taxes, would not place Pittard in the position it would have been in had this contract been performed. Accordingly, this enumeration of error is without merit.

### Case No. A91A0492

5. In view of our ruling in Division 2 of this opinion, we reverse the order of the trial court setting aside the jury's award of attorney fees. See *Powell v. Watson*, 190 Ga. App. 375 (378 SE2d 867) (1989).

*Judgment affirmed in Case No. A91A0491. Judgment reversed in Case No. A91A0492. Birdsong, P. J., and Pope, J., concur.*

DECIDED JUNE 28, 1991 —
RECONSIDERATIONS DENIED JULY 23, 1991 AND JULY 25, 1991 —

*Paul C. Myers*, for appellant.
*Swift, Currie, McGhee & Hiers, Jeffrey Y. Lewis, William C.*

*Collins, Jr.*, for appellee.