629 S.E.2d 635

COLLINS ENTERTAINMENT CORPORATION, Respondent,

v.

COATS AND COATS RENTAL AMUSEMENT, d/b/a Ponderosa Bingo and Shipwatch Bingo, Wayne Coats, individually, and American Bingo & Gaming Corporation, Defendants,

Of whom American Bingo & Gaming Corporation is Petitioner.

No. 26136.

Supreme Court of South Carolina.

Heard April 19, 2005.
Decided April 10, 2006.
Rehearing Denied May 24, 2006.

411

C. Mitchell Brown, Zoe Sanders Nettles, and William C. Wood, all of Nelson Mullins Riley & Scarborough, of Columbia, for Petitioner.

Stephen L. Brown, Edward D. Buckley, Jr., Matthew Kiel Mahoney, all of Young Clement Rivers & Tisdale, of Charleston, and Timothy G. Quinn, of Columbia, for Respondent.

Justice WALLER:

We granted a writ of certiorari to review the Court of Appeals' opinion in *Collins Ent. Corp. v. Coats & Coats Rental Amuse.*, 355 S.C. 125, 584 S.E.2d 120 (Ct.App.2003). The sole issue on certiorari is whether the Court of Appeals erred in utilizing the "lost volume seller" doctrine to calculate damages. We affirm.

## FACTS

In 1996, Collins Entertainment Corporation (Collins) contracted to lease video poker machines to two bingo hall operations known as Ponderosa Bingo and Shipwatch Bingo.[1] The six-year lease required that any purchaser of the premises assume the lease. In 1997, American Bingo and Gaming Corporation (American) purchased the assets of the bingo parlors. American failed to assume the lease and removed Collins' machines from the premises. Collins brought this action against American alleging unfair trade practices, civil conspiracy, and intentional interference with contract. The matter was referred to a master in equity for trial. The master found American liable for intentional interference with contract and awarded Collins actual damages of $157,449.66 and punitive damages of $1,569,013.00.[2] The Court of Appeals affirmed. *Collins Ent. Corp. v. Coats & Coats Rental Amuse.*, 355 S.C. 125, 584 S.E.2d 120 (Ct.App.2003).

## ISSUE

Did the Court of Appeals err in utilizing the "lost volume seller" doctrine to hold Collins did not have a duty to mitigate its damages?

## DISCUSSION

 Comment f to Section 347 of the Restatement (Second) of Contracts states, in part, "if the injured party could

---

1. The parlors were owned by Coats and Coats Rental Amusements, and the Coats' son, Wayne Coats. The Coats were named in the complaint, but are not parties to this appeal.

2. The master dismissed the civil conspiracy claim, and found for American on the unfair trade practices claim.

and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have lost volume and the subsequent transaction is not a substitute for the broken contract." This theory of damages has come to be known as the "lost volume seller" doctrine.[3] A lost volume seller is one whose willingness and ability to supply is, as a practical matter, unlimited in comparison to the demand for the product. Thus, "[t]he lost volume seller theory allows [for the] recovery of lost profits despite resale of the services that were the subject of the terminated contract if the seller . . . can prove that he would have entered into both transactions but for the breach." *Gianetti v. Norwalk Hosp.*, 266 Conn. 544, 833 A.2d 891 (2003). *See also Comeq, Inc. v. Mitternight Boiler Works*, 456 So.2d 264, 268–69 (Ala.1984) (the reason for the rule is based on the idea that the lost volume seller would have received two profits, not just one, if the buyer had not breached, so that a recovery of both profits is necessary to put the seller in as good a position as if there had been no breach). Although the lost volume seller theory is commonly understood to apply to contracts involving the sale of goods, it applies with equal force to contracts involving the performance of personal services. *Id. citing* 22 Am. Jur. 2d 592, Damages § 509 (1988). Whether a seller is a lost volume seller is a

---

**3.** The term "lost volume seller" was coined by Professor Robert J. Harris in his article *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared*, 18 Stan. L. Rev. 66 (1965). As noted by the Fourth Circuit Court of Appeals in *Famous Knitwear Corp. v. Drug Fair Inc.*, 493 F.2d 251 (4th Cir.1974):

> Assume a contract for the sale of a washing machine with a list price of $500. Buyer breaches, and seller resells that washing machine at the same list price that buyer had been willing to pay. However, the resale buyer is one of seller's regular customers who had intended to purchase a washing machine from him anyway. If the seller's total cost per machine was $300, he stood to gain an aggregate profit of $400, that is, $200 profit from each of two sales. Clearly the [UCC] 2–708 contract-market differential formula is inadequate in this situation since it gives no damages to the seller who has lost a $200 profit because of the breach. In such a case the damage award should be the lost profit, that is, $200, for this will place the seller in as good a position as performance would have done.

*Famous Knitwear*, 493 F.2d at 254, n. 5 *citing* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, 7–9, at 226–27 (1972).

question of fact. *Bill's Coal Co. v. Board of Public Utilities,* 887 F.2d 242, 245 (10th Cir.1989); *Rodriguez v. Learjet, Inc.,* 24 Kan.App.2d 461, 946 P.2d 1010, 1014 (1997); Restatement (Second) of Contracts § 347, Comment f (1979).

■ American asserts adoption of the lost volume seller doctrine eliminates a seller's duty to mitigate damages. It contends we should adopt the position advanced by the Pennsylvania Supreme Court in *Northeastern Vending Company v. PDO, Inc.,* 414 Pa.Super. 200, 606 A.2d 936 (1992), in which the court declined to adopt the lost volume seller doctrine stating, summarily, that it would erode the duty to mitigate damages.[4] We decline to adopt the Pennsylvania approach because we do not find the doctrine erodes the duty to mitigate damages. On the contrary, the doctrine realizes that in certain situations, even where a buyer **does** mitigate, if the seller would have made the second sale in any event, then the "lost volume" measure of damages places him in the same position he would have been had the buyer not repudiated.[5] As the Court in *Davis Chemical v. Diasonics Inc.,* 826 F.2d 678, 683, n. 3 (7th Cir.1987), stated, "by definition, a lost volume seller cannot mitigate damages through resale. Resale does not reduce a lost volume seller's damages because the breach has still resulted in its losing one sale and a corresponding profit." *See also Storage Technology Corp. v. Trust Co.,* 842 F.2d 54, 56 n. 2 (3rd Cir.1988) (pointing out that resale does not make a lost-volume seller whole); Matthews,

---

4. It appears Pennsylvania is the only jurisdiction which rejects the concept of the lost volume seller. *See Gianetti v. Norwalk Hosp.,* 64 Conn.App. 218, 779 A.2d 847 (2001), *rev'd in part on other grounds* 266 Conn. 544, 833 A.2d 891 (2003).

5. As stated by one commentator, the *"Northeastern* court's concern over the potential idleness of the lost volume seller is completely unwarranted .... as a general rule, the nonbreaching party has a duty to mitigate its damages by entering into a similar contract. However, the important qualification to this rule is that if the subsequent contract would have been made regardless of the breach, then that contract is not taken into consideration to minimize the damages. This is exactly the ·rule articulated by the second Restatement of Contracts and which the Northeastern court chose to ignore." Daniel Matthews, *Should the Doctrine of Lost Volume Seller Be Retained: A Response to Professor Breen,* 51 U. Miami L.Rev. 1195, 1214 (1997) (hereinafter Matthews article).

*infra,* 51 U. Miami L.Rev. at 1214 (noting that the philosophical heart of the lost volume theory is that the seller would have generated a second sale irrespective of the buyer's breach such that it follows that the lost volume seller cannot possibly mitigate damages).

■ Further, we find the legislature's adoption of S.C.Code Ann. § 36-2A-528(2) is consistent with adoption of the lost volume seller doctrine. Section 36-2A-528(2) (dealing with leased goods) [6] tracks the language of S.C.Code Ann. § 36-2-708(2) (seller's damages for sales). Section 36-2-708 clearly tracks the provisions of the Uniform Commercial Code section (UCC § 2-708(2)) upon which the lost volume seller doctrine is premised. *See generally,* Jerald B. Holisky, *Finding the Lost Volume Seller; Two Independent Sales Deserve Two Profits Under Illinois Law,* 22 J. Marshall L.Rev. 363 (Winter 1988) (recognizing that the lost profit seller doctrine emanates from UCC 2-708(2)); Jonathan J. Lautt, *Contract Law: A Clean Start for Lost Volume Lessees,* 34 Washburn L.J. 136 (Fall 1994) (recognizing that section 82-2-708(2) of the Kansas Statutes codifies the lost volume recovery for the sale of goods). By adoption of S.C.Code Ann. § 36-2A-528(2), we find the Legislature has tacitly approved of the lost volume seller doctrine.

■ American next asserts there is insufficient evidence in the record to demonstrate that Collins is a lost volume seller. We disagree. There is no one set test to determine whether one is a lost volume seller. According to one commentator:

Professor Harris has developed three main requirements that a lost volume seller must meet: (1) the person who bought the resold entity would have been solicited by the plaintiff had there been no breach or resale; (2) the solicitation would have been successful; and (3) the plaintiff could

---

6. That section provides, in part, "[i]f the measure of damages ... is inadequate to put a lessor in as good a position as performance would have, the measure of damages is the present value of the profit, including reasonable overhead, the lessor would have made from full performance ... together with any incidental damages ... due allowance for costs reasonably incurred and due credit for payments or proceeds of distribution."

have performed that additional contract. Most American courts and commentators have adopted these requirements.[7] Saidov, *The Methods for Limiting Damages Under the Vienna Convention on Contracts for the Sale of Goods*, 14 Pace Int'l L. Rev. 307 (Fall 2002), *citing* Jerald B. Holisky, *Finding the Lost Volume Seller: Two Independent Sales Deserve Two Profits under Illinois Law*, 22 J. Marshall L. Rev. 363, 375 (1998).

Here, there is testimony in the record which indicates that Collins had surplus machines on hand and that, had another location been available, it could and would have supplied those locations with video machines. Further, Collins did place 19 of the 20 machines which were removed from Shipwatch and Ponderosa into other premises. As found by the Master, it is patent that Collins had excess inventory with which to supply and rotate machines through all of its customers.

■■■ American argues there has been no showing by Collins that the specific type of machines removed from the Shipwatch and Ponderosa were available at its warehouses, such that it has failed in its burden to demonstrate it had

---

7. Other "tests" have been adopted. For example, in *Sunrich v. Pacific Foods of Oregon*, 2004 WL 1124495 (D.Or.2004), the District Court for the District of Oregon held that "[a]s an alleged lost volume seller, Pacific therefore bears the burden of establishing that its production capacity was such that, if Sunrich had not breached the Packing Agreement, Pacific would have been able to meet Sunrich's requirements, as well as the needs of alternative buyers." *See also Van Ness Motors v. Vikram*, 221 N.J.Super. 543, 535 A.2d 510, 511 (A.D.1987) (recognizing that "[m]ost other jurisdictions have held that to qualify as a 'lost volume' seller under Section 2–708(2), the seller needs to show only that it could have supplied both the breaching purchaser and the resale purchaser"); *Iran v. Boeing Co.*, 771 F.2d 1279 (9th Cir.1985); *Teradyne, Inc. v. Teledyne Industries*, 676 F.2d 865, 868 (1st Cir.1982); *Autonumerics, Inc. v. Bayer Industries*, 144 Ariz. 181, 696 P.2d 1330, 1340–41 (Ct.App.1984); *National Controls, Inc. v. Commodore Business Machines, Inc.*, 163 Cal.App.3d 688, 696–98, 209 Cal.Rptr. 636, 641–43 (1985). An even more lenient test, as set forth by the Georgia Court of Appeals, requires that "[the seller] must prove that even though he later resold the repudiated contract goods, the sale to the third party would have been made regardless of the buyer's breach *so that the seller would have realized two profits from two sales.* The **key inquiry is the sellers' ability to provide the product to both the breaching buyer and the resale buyer.**" *Unique Designs, Inc. v. Pittard Machinery Co.*, 200 Ga.App. 647, 409 S.E.2d 241, 243 (1991) (emphasis supplied).

excess capacity. We disagree. Initially, although American argued there was insufficient evidence of excess capacity below, it made no argument with respect to the specific types of machines at issue. Accordingly, as this specific argument was not raised below, it is not preserved. In any event, Collins presented testimony from its assistant comptroller for accounting that, although there were ten machines in each location (i.e., the Shipwatch and Ponderosa), a total of 48 machines rotated through the locations. Livingston also testified that "we had machines in the warehouse that could have easily replaced these 48 at the 130 locations." Livingston's testimony is sufficient to establish that Collins had more supply capacity of these machines than it had demand. Moreover, the lease agreement between Collins and Coats and Coats Rental gives Collins the right to furnish "all video game terminals and all coin operated music and amusement machines, to include a special multi-player Black Jack/Poker unit." We find no requirement (other than one multi-player poker unit) that Collins place any particular machines on the premises, such that Collins was free to have utilized any of its machines at the Ponderosa and Shipwatch. Accordingly, Collins was not required to demonstrate excess capacity as to a specific type of machine.

## . CONCLUSION

Contrary to the arguments raised by American, we find adoption of the lost volume seller doctrine does not eliminate a seller's duty to mitigate his damages. The doctrine simply recognizes that, in situations in which the seller has excess capacity and would, in any event, have made both sales, the lost volume measure of damages is necessary to place the seller in the same position he would have been had the buyer not repudiated. Further, there is sufficient evidence to demonstrate that Collins was, in fact, a lost volume seller in this case. Accordingly, the opinion of the Court of Appeals utilizing the lost volume seller doctrine is affirmed.[8]

**AFFIRMED.**

---

8. The dissent contends adoption of the lost volume seller doctrine is inappropriate, claiming the doctrine does not apply to tort claims. However, American never argued below that the doctrine did not apply

MOORE, J., concurs.

PLEICONES, J., concurring in a separate opinion.

TOAL, C.J., dissenting in a separate opinion in which BURNETT, J., concurs.

### Justice PLEICONES concurring:

I concur in the majority's express adoption of the lost-volume-seller doctrine and in the result. A lost-volume seller, or lessor, cannot mitigate his damages, so there is no duty to try. Evidence in the record supports the finding that Collins is a lost-volume lessor. I write separately because my analysis differs from the majority's on some issues.

In note 8, the majority asserts that the issue whether the lost-volume-seller doctrine can apply in contract but not tort, an issue addressed in the dissent, is not preserved. I disagree. The issue is within the ambit of the main issue in the case ... whether the doctrine ever applies. I nonetheless disagree with the dissent that the lost-volume-seller doctrine can apply in breach-of-contract cases but not in tortious-interference cases.

As noted in the dissent: "The nexus between the two causes of action [breach of contract and tortious interference with contract] is the breach of the contract, for ... breach of the contract is an element of both causes of action. This is the element from which the injured party's actual damages flow on both the contract and tort claims." *Collins Music Co. v.*

---

to Collins' claim for tortious interference with contract. Although American argued, generally, against adoption of the lost volume seller doctrine, it did not raise the argument now advanced by the dissent. Accordingly, in my opinion the dissent errs in raising and addressing this issue sua sponte. *See State v. Cutro,* 332 S.C. 100, 107, 504 S.E.2d 324, 327 (1998) (Toal dissenting) (issue which is procedurally barred should not be raised sua sponte by this Court); Rule 226(d)(2), SCACR (issue must be raised in initial arguments to Court of Appeals). *See also Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review).

Moreover, as noted by Justice Pleicones' concurrence, the only issue on certiorari is whether or not to adopt the lost-volume seller doctrine, and whether it applies in this case. The issue of double recovery as addressed in Justice Toal's dissent is not before this Court.

*Smith,* 332 S.C. 145, 147, 503 S.E.2d 481, 481 (Ct.App.1998) (quoting *Ross v. Holton,* 640 S.W.2d 166, 173 (Mo.Ct.App. 1982)). In sum, contract damages are part of tortious-interference damages. The nature of the claim, whether contract or tort, does not affect the method of determining the damages flowing from the plaintiff's loss of contract expectations, and the lost-volume-seller doctrine merely provides one such method. There is no reason that the doctrine cannot apply in a tortious-interference case.

With respect to the dissent's conclusion that Collins has received a double recovery, I agree, but the writ of certiorari that we granted did not encompass the issue. The only issues before us are whether the lost-volume-seller doctrine can apply in South Carolina and whether it applies in this case.

For the reasons above, I concur in the result reached by the majority.

Chief Justice TOAL dissenting:

I respectfully dissent. In my view, the "lost volume seller" doctrine should not be adopted and applied in this case. Moreover, in my view, the court of appeals erred in affirming the trial court's calculation of damages. Therefore, I would reverse and remand.

The lost volume seller doctrine is a measure of damages applied in cases involving breach-of-contract claims. *See, e.g., Gianetti v. Norwalk Hosp.,* 266 Conn. 544, 833 A.2d 891 (2003); *Jetz Serv. Co., Inc. v. Salina Properties,* 19 Kan. App.2d 144, 865 P.2d 1051 (1993).

The present case, however, involves an allegation of tortious interference with contract.[1] As its name implies, tortious interference with contract is a tort, requiring the plaintiff to establish, among other things, intentional procurement of the contract's breach. *See, e.g., Camp v. Spring Mortg. Co.,* 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993); *Todd v. S.C. Farm Bureau Mut. Ins. Co.,* 287 S.C. 190, 192–93, 336 S.E.2d 472, 473 (1985). Consequently, damages for tortious interference

---

1. This cause of action is also referred to as "intentional interference with contract." *Todd v. S.C. Farm Bureau Mut. Ins. Co.,* 287 S.C. 190, 192, 336 S.E.2d 472, 473 (1985).

of contract "are not measured by contract rules." *Collins Music Co., Inc. v. Smith,* 332 S.C. 145, 147, 503 S.E.2d 481, 482 (Ct.App.1998) (quoting *Ross v. Holton,* 640 S.W.2d 166 (Mo.Ct.App.1982)).

Because the lost volume seller doctrine applies in breach-of-contract cases only, and because the present case involves a tort, the court of appeals, in my view, erred in adopting and applying the doctrine.

Moreover, in my view, the court of appeals erred in affirming the trial court's calculation of damages. A plaintiff may not recover twice for the same injury. *Riddle v. City of Greenville,* 251 S.C. 473, 478, 163 S.E.2d 462, 464 (1968); *Collins Music Co., Inc. v. Smith,* 332 S.C. 145, 147, 503 S.E.2d 481, 482 (Ct.App.1998). In *Smith,* Collins brought an action against one party for breach of contract and against a second party for tortious interference with contractual relations. The jury awarded $10,000 in actual damages on the breach-of-contract claim and $10,000 in actual damages for the tortious-interference claim. After granting the defendants' motions to amend the judgment, the trial court entered a single judgment of $10,000. The court of appeals affirmed. *Id.*

In affirming the award of a single judgment, the court explained as follows:

While the causes of action [of breach and tortious interference] involve separate and distinct wrongful acts committed by different parties, there are important commonalities which affect the damages question. The *nexus between the two causes of action is the breach of the contract,* for ... breach of the contract is an element of both causes of action. *This is the element from which the injured party's actual damages flow on both the contract and tort claims.* This does not mean, however, that the measure of actual damages on both causes of action are coextensive.

Under the contract claim the injured party can recover actual damages for the direct and natural consequences of the breach, or for damages that were within the contemplation of the contracting parties. The damages recoverable for intentional interference are not measured by contract rules. The injured party can recover from the tortfeasor: the pecuniary loss of the benefits of the contract; conse-

quential losses for which the interference is the legal cause; and, emotional distress or actual harm to reputation if they are reasonably to be expected to result from the interference. Thus, *the actual damages under the contract claim and tort claim will be coextensive only with respect to the lost benefits of the contract which were a direct and natural consequence of the breach*, or within the contemplation of the contracting parties.

[The injured party] cannot collect double recovery (once from each defendant) for actual damages which are coextensive under the contract and tort claims.

*Id.* at 147–48, 503 S.E.2d at 482 (quoting *Ross v. Holton,* 640 S.W.2d 166 (Mo.Ct.App.1982) (internal citations omitted)) (emphasis added).

In the present case, Collins was awarded actual damages for the breach-of-contract claim in the amount of $232,628.00,[2] plus $66,255.00 in pre-judgment interest. Collins was also awarded $157,449.66[3] in actual damages for the tortious-interference claim, plus $1,569,013.00 in punitive damages.

In my view, Collins should not have received two separate actual damages awards for a single breach of contract. By awarding damages under both the breach-of-contract and tortious-interference claims, the trial court improperly awarded Collins the lost benefits of the contract twice. Because the evidence regarding damages was the direct and natural consequence of a single breach, Collins was not entitled to the full amount of actual damages under both causes of action.

While I disagree that the lost volume seller doctrine is applicable in a tort case, I would urge that if the doctrine is to be adopted that the doctrine be applied correctly.

---

**2.** This award was calculated based on the terms of the contract signed by Collins and the other defendants, Coats and Coats Rental Amusements and Wayne Coats. The contract provides that in the event of a breach, Collins shall be "entitled to liquidated damages in an amount equal to Collins' average weekly share of the contents of the coin boxes, prior to said breach, multiplied by the number of weeks remaining in the unexpired term of this agreement."

**3.** Like the award for breach of contract, the award for tortious interference was calculated by taking Collins' average revenue experience prior to the breach, multiplied by the number of weeks remaining in the contract. The difference in this award, though, is that license fees and other operating expenses were deducted from the final amount.

Generally, the lost volume seller doctrine allows for the recovery of the lost profits resulting from the breach by showing that the party would have been able to enter into the beached contract and a subsequent contract even if there was no breach. *Unique Designs, Inc. v. Pittard Machinery Co.,* 200 Ga.App. 647, 649, 409 S.E.2d 241, 243 (Ga.Ct.App.1991). However, the majority's application of the doctrine allows for the double recovery from the *same* breach. In essence, the application of the doctrine by the majority allows for the recovery of one set of damages for the breach-of-contract and second recovery in tort for the tortious-interference with contract claim resulting from the *same* breach but brought about by joint actors.

As outlined above, in the present case, Collins settled its claim for breach of contract against Coats. In addition, Collins sought damages against American Bingo for tortious interference of contract. As a result, any recovery from American Bingo would have to be set off against any recovery from Coats. *See* Restatement 2d Torts § 774(2) (stating that payments made by the third person in settlement of the claim must be credited against the liability for causing the breach and go to reducing the damages for the tort). Accordingly, I write to prevent a *third* recovery on the part of Collins.

In addition, I disagree with the concurrence that the issue of double recovery is not before the Court. In my opinion, the issue arrives before this Court within the issue of when and how the lost volume seller doctrine is applied. As a result, I believe the Court should hold that the any recovery from American Bingo represents a double recovery and this amount should be offset from the Coats' settlement.

Therefore, in my view, the court of appeals erred in using the lost volume seller doctrine to affirm the damages award. Moreover, in my view, the trial court's calculation of damages was incorrect. Consequently, I would reverse and remand this case for a re-calculation of damages.[4]

BURNETT, J., concurs.

---

4. On remand, the court should also reconsider the award of punitive damages. *See McGee v. Bruce Hosp. Sys.,* 344 S.C. 466, 545 S.E.2d 286

(2001) (there must be an award of actual or nominal damages for a
verdict of punitive damages to be supported).