# CHARLES D. GIANETTI *v.* NORWALK
# HOSPITAL ET AL.
# (AC 20197)

Landau, Mihalakos and Dupont, Js.

Argued April 5—officially released July 10, 2001

*William F. Gallagher*, with whom were *Alan Neigher*, and, on the brief, *Hugh D. Hughes* and *Judith M. Trutt*, for the appellant (plaintiff).

*Robert A. Lacobelle*, with whom, on the brief, was *Samantha A. Kretzmer*, for the appellee (defendant Norwalk Hospital).

*Opinion*

DUPONT, J. The plaintiff appeals from the judgment of the trial court rendered after it denied his motion for a permanent injunction and awarded him $1 as nominal damages in his action against the defendants for breach of contract. The fundamental issue is whether a "lost volume seller" theory of damages as provided in 3 Restatement (Second), Contracts §§ 347, comment (f), and 350, comment (d) (1981), should be followed in cases involving a breach of a contract for personal services, a question of first impression in Connecticut. We conclude that the Restatement should be followed and that the plaintiff is a lost volume seller as defined

in the Restatement on the basis of the particular facts of this case. We also conclude that the plaintiff was entitled to more than nominal damages for the breach of his contract with the defendant hospital.[1] We affirm the judgment as to the denial of a permanent injunction, reverse the judgment of $1 and remand the matter to the trial court for a hearing in damages, limited to finding the amount due the plaintiff for his lost profit in 1984, as a result of the defendants' breach of the contract.

This case has had an interminable judicial life. It began with a complaint in December, 1983, in which the plaintiff, a licensed plastic surgeon with staff privileges at the defendant hospital, sought damages and an injunction to prevent the defendants from denying his reappointment to the hospital medical staff. The case was referred to an attorney trial referee, who found in his report that there was an enforceable contract between the hospital and the plaintiff, and that the hospital had breached the contract because the defendants had failed to follow the procedural requirements of its bylaws in terminating his appointment. The defendant objected to the acceptance of the report, whereupon the parties agreed to reserve two questions of law for appellate review, which our Supreme Court decided in *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 557 A.2d 1249 (1989).

In *Gianetti*, our Supreme Court held that the bylaws of the hospital did not create a contract between the plaintiff and the defendant hospital but that there was, nevertheless, a contractual relationship between the hospital and the plaintiff. "[T]he medical staff bylaws, per se, do not create a contractual relationship between

---

[1] The defendants are Norwalk Hospital (hospital), the chairman of the department of surgery of the hospital, the chief of staff of the hospital, the president of the hospital, and the chief of plastic and reconstructive surgery at the hospital.

the hospital and the plaintiff but because of the undertakings of the plaintiff and the hospital and because the hospital has a duty to obey its bylaws, the bylaws have now become 'an enforceable *part* of the contract' between the hospital and this physician to whom it has given privileges at the hospital." (Emphasis in original.) Id., 63. Our Supreme Court also determined that the rights and duties arising out of the contractual relationship are subject to judicial review.

The trial court subsequently accepted the referee's report, rendered a judgment of liability and referred the matter for a hearing. After that hearing, the court denied a permanent injunction because the plaintiff had not proved irreparable harm or that he was without an adequate remedy at law and awarded the plaintiff $1 as nominal damages. The court held that none of the evidence offered at the hearing in damages provided a reasonable basis for establishing with reasonable certainty any economic loss or damages arising out of the defendants' breach of contract. The court's reasoning was based on its conclusion that the case was not a "lost volume seller" case because such cases do not apply to contracts for personal services and that the doctrine of mitigation of damages applied.[2]

The relevant facts are not disputed. The plaintiff is a solo physician providing medical services in the field of plastic surgery. In 1974, he was appointed as a provisional staff member of the defendant hospital. In 1977, and yearly thereafter until the end of December, 1983, he was granted privileges as an assistant attending staff physician. The hospital grants staff privileges for one year terms subject to reapplication for the renewal of privileges at the end of each year. The plaintiff had

---

[2] The doctrine of mitigation of damages requires the nonbreaching party to a contract to make reasonable efforts to minimize damages arising from the breach. *Danpar Associates* v. *Somersville Mills Sales Room, Inc.*, 182 Conn. 444, 446, 438 A.2d 708 (1980).

applied for reappointment for the 1984 calendar year. The board of directors, on the basis of the recommendations of its committees, would either reappoint a physician to the hospital staff and grant him privileges for another term of one year[3] or decline to reappoint him.[4] The hospital did not reappoint the defendant for the 1984 calendar year.

As an assistant attending staff physician, the plaintiff worked primarily in the defendant hospital's emergency room. Neither the plaintiff nor the other plastic surgeons on the hospital staff needed to be or remain physically in the emergency room, but were on call in the event the hospital required their services. The plaintiff had staff privileges at the defendant hospital at the same time as he had staff privileges at four other hospitals. During the last full year that the plaintiff was on the staff of the defendant hospital, there were three plastic surgeons on the defendant's staff. The plastic surgeons on call at the defendant hospital were also on call at other hospitals at the same time. Each physician on the defendant hospital's staff as a plastic surgeon, including the plaintiff, was responsible for billing the patient treated or the patient's health provider for any emergency services performed.

In 1984, the year immediately following the termination of his staff privileges, the plaintiff's gross income for the services performed at other hospitals was $225,815. In 1983, the plaintiff had a gross income from services he performed at the defendant hospital of

[3] Article III, § 3b, of the medical staff bylaws states: "Reappointments shall be for a period not more than one calendar year. For the purposes of these bylaws the medical staff year commences on the first day of January and ends on the thirty-first day of December of each year."

[4] Article V of the medical staff bylaws, entitled "Procedure for Appointment and Reappointment," provides in § 2b that "the department concerned shall determine whether to recommend to the medical staff that the practitioner be appointed to the medical staff . . . ."

$43,687, gross income from all other hospitals of $172,890 and a net overall income of $112,375.

On the basis of those facts, the court concluded that the plaintiff could not qualify as a lost volume seller pursuant to the Restatement. The court determined that this was not a lost volume seller case "where the claimant had enough capacity to have fully performed the contract as well as his or its other business." The court relied on *McMahon* v. *Bryant Electric Co.,* 121 Conn. 397, 185 A. 181 (1936), to conclude that a lost volume seller theory of damages had been adopted in Connecticut, but that the theory did not apply to contracts for personal services.[5] Whether the seller of personal services can be treated for purposes of a damages award as a lost volume seller is a question of law, but whether the plaintiff could or would have taken on additional work at the same time as the original contract is a question of fact to be determined by the trier.

The term "lost volume seller" is usually attributed to Professor Robert J. Harris. See R. Harris, "A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared," 18 Stan. L. Rev. 66 (1964). As the title of the article implies, that theory of damages usually applies to the sale of goods. See General Statutes § 42a-2-708 (2). The pertinent sections of the Restatement (Second), Contracts, with

---

[5] The court cites *McMahon* as determinative of the validity in Connecticut of the theory of lost volume seller damages in contracts for the sale of goods. The defendant does not mention the case in its brief and the plaintiff disputes the accuracy of such a holding. The court also noted that such a theory cannot apply to personal service contracts because of the holding in *McMahon.* We read the case as holding that the doctrine of mitigation of damages applies to contracts of personal service in some instances, but that in other cases the party injured is not obliged to seek and perform other contracts for the benefit of the breacher of the contract. Thus, although the decision does not mention the Restatement of Contracts or use the words "lost volume," it does embrace its rationale, but is silent as to its use in the sale of personal services.

which we are concerned, apply, however, also to the sale of services. The measure of damages in such cases is the lost volume of business that the nonbreaching seller in a contract for the sale of goods or services incurs because of the buyer's breach, undiminished by the profits from the sale of similar goods *or services* during the term of the breached contract. *Snyder* v. *Herbert Greenbaum & Associates, Inc.*, 38 Md. App. 144, 154 & n.3, 380 A.2d 618 (1977). A lost volume seller can have two expectations, a profit from the breached contract and a profit from one or more other contracts that the seller can perform simultaneously with the breached contract. Id.

The exact term "lost volume seller" is not used in the Restatement (Second), Contracts, but those words provide the basis for the analysis in those cases and law review articles involving §§ 347 and 350. Comment (d) of § 350 of the Restatement (Second), Contracts provides: "The mere fact that an injured party can make arrangements for the disposition of the goods *or services* that he was to supply under the contract does not necessarily mean that by doing so he will avoid loss. If he would have entered into both transactions but for the breach, he has 'lost volume' as a result of the breach. See comment f to § 347. In that case the second transaction is not a 'substitute' for the first one. See illustrations 9 and 10 [of comment (d)]." (Emphasis added.) At the outset, we note that the comment embraces both goods and services, and that illustration 10[6] in comment (d) involves a contract for personal service, the paving of a parking lot, rather than the

---

[6] Illustration 10 reads as follows: "A contracts to pay B $20,000 for paving A's parking lot, which would give B a net profit of $3,000. A breaks the contract by repudiating it before B begins work. If B would have made the contract with A in addition to other contracts, B's efforts to obtain other contracts do not affect his damages. B's damages for A's breach of contract include his $3,000 loss of profit." 3 Restatement (Second), supra, § 350, comment (d), illustration 10.

supply of goods. The key to when plaintiffs can keep the monetary benefits of the breached contract, undiminished by the doctrine of mitigation of damages, lies in whether the plaintiffs could have and would have entered a second contract simultaneously with the breached contract, in which event, the second contract is not a substitute for the first.

Comment (f) of § 347 provides examples of "lost volume" cases. In relevant part, the comment provides: "If the injured party could and would have entered into the subsequent contract, even if the [original] contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract. . . ." 3 Restatement (Second), supra, § 347, comment (f). The comment also provides that it is a question of fact whether the injured party would have chosen to enter the second transaction if there had been no breach of the first contract.

"[T]he lost-volume rule has been recognized throughout the country." *CIC Corp.* v. *Ragtime, Inc.*, 319 N.J. Super. 662, 668, 726 A.2d 316 (App. Div. 1999). Many state courts, as well as judicial commentators, have determined that in appropriate circumstances, the Restatement's lost volume seller theory should be used in awarding damages.[7] D. Matthews, "Should the Doctrine of Lost Volume Seller Be Retained? A Response to Professor Breen," 51 U. Miami L. Rev. 1195, 1197 (1997). "The philosophical heart of the lost volume theory is that the seller would have generated a second sale irrespective of the buyer's breach. It follows that

---

[7] Pennsylvania is the only jurisdiction of which we are aware in which a court has rejected the concept of the lost volume seller. See *Northeastern Vending Co.* v. *P.D.O., Inc.*, 414 Pa. Super. 200, 204–205, 606 A.2d 936 (1992).

the lost volume seller cannot possibly mitigate damages. For this reason, the majority of both courts and commentators have recognized the illegitimacy of the mitigation argument." Id., 1214. The definition of a lost volume seller makes a mitigation of damages doctrine unusable.

Most of the lost volume seller cases involve the sale of goods, rather than personal service; see, e.g., *Seaboard Music Co.* v. *Germano*, 24 Cal. App. 3d 618, 101 Cal. Rptr. 255 (1972); *Wired Music, Inc.* v. *D.M. Clark*, 26 Ill. App. 2d 413, 168 N.E.2d 736 (1960); *Jetz Service Co.* v. *Salina Properties*, 19 Kan. App. 2d 144, 865 P.2d 1051 (1993); *CIC Corp.* v. *Ragtime, Inc.*, supra, 319 N.J. Super. 662; but, as previously discussed, the Restatement sections involved in this case apply to the sale of services as well.

A number of courts have adopted the Restatement's theory of damages in situations involving personal services. *Katz Communications, Inc.* v. *Evening News Assn.*, 705 F.2d 20, 26 (2d Cir. 1983); *Ullman-Briggs, Inc.* v. *Salton, Inc.*, 754 F. Sup. 1003, 1008–1009 (S.D.N.Y. 1991), aff'd without opinion sub nom. *Ullman-Briggs, Inc.* v. *Deerfield Housewares, Inc.*, 100 F.3d 942 (2d Cir. 1996); *Donald Rubin, Inc.* v. *Schwartz*, 191 App. Div. 2d 171, 594 N.Y.S.2d 193 (1993), aff'd, 220 App. Div. 2d 323, 632 N.Y.S.2d 787 (1995); *Lone Star Ford, Inc.* v. *McCormick*, 838 S.W.2d 734, 740 (Tex. App. 1992), writ denied (Jan. 27, 1993).

A nonexclusive personal services contract requiring a limited amount of time, but not requiring that the seller devote all of his time to the buyer, allows the seller to receive damages as a lost volume seller if that seller can demonstrate that he intended to take on additional contracts and that he had the capacity to enter other contracts. *Lone Star Ford, Inc.* v. *McCormick*, supra, 838 S.W.2d 740. Only when the breach

enables a wronged seller to earn additional income should the court use the mitigation of damages doctrine to reduce the amount of damages the breaching buyer of the personal service has to pay the wronged seller. *Donald Rubin, Inc.* v. *Schwartz*, supra, 191 App. Div. 2d 172. If, however, the seller could and would have entered a second transaction simultaneously, the seller's damages are based on the net profit he or she lost as a result of the breach, without any deduction by the buyer for the profit from services rendered by the seller to others. Id.

Whenever new markets for a plaintiff are additional volume, and not a substitute for the old breached contract, a plaintiff may recover damages as a lost volume seller without a deduction from those damages of the net income received from new clients. *Katz Communications, Inc.* v. *Evening News Assn.*, supra, 705 F.2d 26. If a contract does not require all of the time of the seller and does not preclude the seller from undertaking the performance of other contracts simultaneously, the seller is not obliged to minimize damages by reducing the amount the breaching buyer owes for the breach. *Seaboard Music Co.* v. *Germano*, supra, 24 Cal. App. 3d 623.

In sum, for sellers of personal services to come within the purview of the Restatement's lost volume seller theory and recover their undiminished lost profit from the breaching buyer, they must establish the capacity to make an additional sale, that it would have been profitable to make an additional sale of personal services and that they probably would have made an additional sale absent the buyer's breach. *Rodriguez* v. *Learjet, Inc.*, 24 Kan. App. 2d 461, 466–67, 946 P.2d 1010 (1997).

The defendant relies on *Davis* v. *West Community Hospital*, 755 F.2d 455 (5th Cir. 1985), another case

involving the sale of personal services. In that case, the plaintiff physician, who had staff privileges at two hospitals, was unsuccessful in his action for damages for the suspension of his staff privileges because his income increased following his suspension. The theory under which the plaintiff presented his claim, however, was a tortious interference with a business relationship, rather than a claim as a lost volume seller. Id., 466. The court in *Davis* did not discuss the lost volume seller theory and applied the doctrine of mitigation of damages. Because that case is distinguishable, we discount its value in deciding the present case and rely instead on the other cases that have followed the same sections of the Restatement as are here involved.

In deciding whether Connecticut ought to allow recovery on the basis of the theory of damages of 3 Restatement (Second), Contracts §§ 347 and 350, we recognize that Restatements of the Law are an authoritative source for many of our holdings. See, e.g., *Binette* v. *Sabo*, 244 Conn. 23, 34, 710 A.2d 688 (1998); *Darling* v. *Burrone Bros., Inc.*, 162 Conn. 187, 198, 292 A.2d 912 (1972); *Wachtel* v. *Rosol*, 159 Conn. 496, 499–500, 271 A.2d 84 (1970). We hold that the Restatement sections discussed in this opinion should be followed in those personal services cases where the plaintiff sellers can show by a preponderance of the evidence that they would and could have performed another contract simultaneously for the same time period that the breached contract would have run, and that in such instances a wrongdoer buyer cannot deduct the revenue from the second contract from the profit that would have been due were it not for the breach. In other words, the doctrine of mitigation of damages is not applied in such cases, and the measure of damages is the amount the plaintiff would have earned from the performance of the breached contract were it not for the breach, less any costs attributable to its performance.

The plaintiff's loss of the monetary benefit of the breached contract in such cases should not be affected by the net revenue earned elsewhere, and that loss is the appropriate award of damages. See 22 Am. Jur. 2d Damages § 509 (1988). Because the trial court in this case concluded that the plaintiff's award of damages could not be based on a lost volume seller theory, the court applied the doctrine of mitigation of damages. Applying that doctrine in a well reasoned analysis, the court found that the plaintiff's income had increased over the years since 1984 when he was not reappointed to the staff, that the plaintiff's exhibits to prove damages were flawed, and that there was no reasonable certainty that any economic loss or damage arose from the defendants' breach of contract. The court, therefore, awarded the plaintiff $1 in nominal damages. If this were a case in which a lost volume seller theory of damages could not and did not apply, and if, therefore, the defendant would have the benefit of the mitigation of damages doctrine, we would agree with the trial court.

In this case, the uncontroverted facts were that the plaintiff had the capacity to enter into other contracts with other hospitals simultaneously with his contract with the defendant hospital, that it was profitable for him to do so and that he would have made such additional sales of his services in the future, whether or not the hospital breached its contract with him. The plaintiff has shown that it was more probable than not that he would have worked during 1984 at a number of hospitals as well as at the defendant hospital had he continued to be a member of the staff at the defendant hospital. Although ordinarily whether the plaintiff intended to enter additional contracts is a question of fact, no other conclusion is possible here on the basis of the subsidiary facts found by the trial court. We conclude that as a matter of law, in a contract for personal services in some cases, such as this one, a seller can, in the event

of a breach, receive an award of damages in accord with the particular comments of the Restatement (Second), Contracts, and that the application of a mitigation of damages doctrine in such cases would be improper.

Because we have determined that Connecticut, in appropriate cases, should follow 3 Restatement (Second), Contracts §§ 347, comment (f), and 350, comment (d), in situations involving the sale of personal services, we next consider whether the plaintiff in this case was entitled to more than nominal damages.

At the hearing in damages held in 1999, the plaintiff claimed that his financial loss should be measured by the additional income he would have earned at the defendant hospital during the fifteen years that had elapsed since his loss of staff privileges in 1984, as well as for the next ten years from 1999 that he intended to work.

To determine the proper amount to which the plaintiff is entitled as damages, we must decide the length of time during which he would be entitled to lost profits. In the cases previously discussed, the terms of the contract for the sellers of personal service had not yet expired at the time of the buyers' breach, and damages were based on the net profits for the unexpired term of the breached contract.

The interpretation of a written contract is a question of law. *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 179, 544 A.2d 1185 (1988). Here, at the end of 1983, if the plaintiff had been allowed to continue as a staff member of the defendant hospital it would have been for one year. The term of each of his contracts was for one year and any breach of a contract could, as a maximum, only involve one year.

The attorney trial referee's report was based on a breach by the defendant hospital of certain of its bylaws

governing the procedure involved in the steps required for nonreappointment of a member of the hospital staff. The report was accepted, which was tantamount to a finding of liability for the breach. Had the bylaws been followed, the plaintiff would either have been appointed for one additional year, beginning January 1, 1984, or his contract would have been terminated on December 31, 1983. If we assume the latter, the defendant hospital would be encouraged to ignore procedural guidelines since such a breach would only provide the plaintiff and others, similarly situated, with nominal damages. The defendant would only need to wait until near the end of the term of a one year contract, fail to renew, not fulfill procedural requirements and then owe nominal damages. The cost to the defendant then "by doing wrong" would be minimal; the plaintiff would have won the battle of being properly treated as a lost volume seller of personal services but would have lost the war in terms of damages. As a matter of public policy, courts should consider remedies that discourage breaches of contract. D. Matthews, supra, 51 U. Miami L. Rev. 1217–18.

The plaintiff seeks an award of damages for twenty-five years. We conclude, however, that damages embracing more than one year on the basis of the facts of this case are not warranted. The plaintiff had a personal services contract for 1983, probably renewable for another year, 1984, not a twenty-five year annuity for his working personal services life. The plaintiff's damages should encompass one year, 1984.

Those damages must be ascertained by finding what the net profits from a contract with the defendant would have produced in 1984 had the defendant not breached the contract. See *Katz Communications, Inc.* v. *Evening News Assn.*, supra, 705 F.2d 26. In ascertaining that sum, the trial court has the right to resort to reasonable conjecture and probable estimates, and to make the

best approximation possible. Id., 25; see also *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin,* 247 Conn. 48, 69–70, 717 A.2d 724 (1998) (profits in year prior to breach to be extrapolated to time remaining on contract that was breached). If there is an appreciable savings to the plaintiff as a result of not having to perform the contract, that savings should be deducted from the damages otherwise due to the plaintiff to find the plaintiff's net profit. *Katz Communications, Inc.* v. *Evening News Assn.,* supra, 26.

The plaintiff is due the net profit he would have had during 1984 at the defendant hospital had his contract not been breached, plus any interest that may be awarded on that sum. See General Statutes § 37-3a. The liability in this case was a delict based on a procedural deficiency. Liability here is not inextricably intertwined with damages due, and a new trial as to both damages and liability is not necessary. See *Harewood* v. *Carter,* 63 Conn. App. 199, 772 A.2d 764 (2001). Accordingly, our remand is limited to damages only.

The plaintiff claims, in the alternative, that if he is not afforded a new hearing in damages, he should be awarded a permanent injunction providing him with reinstatement to his former position on the staff of the defendant hospital. Although we have concluded that a hearing in damages is necessary, we briefly discuss the alternative claim. The trial court concluded that the injunctive relief sought by the plaintiff was not warranted. We agree.

The plaintiff did not introduce any evidence that due to the denial of his staff position, he failed to obtain malpractice insurance or was not allowed to take board examinations or file applications at other hospitals for staff privileges, which failures might have caused irreparable harm. He has an adequate remedy at law because any damage to him is redressed by our remand to deter-

mine the amount of money required to put him in the position he would have enjoyed had there been no breach.

We affirm the judgment denying the plaintiff a permanent injunction; we reverse the judgment of $1 as to amount only and remand the matter for a hearing in damages to ascertain the amount of the net profit the plaintiff would have obtained in 1984 from his contract with the hospital had there been no breach of contract and with direction to thereafter render judgment for the plaintiff in that amount.

In this opinion the other judges concurred.