CHARLES D. GIANETTI *v.* NORWALK
HOSPITAL ET AL.
(SC 16640)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued January 13—officially released November 11, 2003

*Robert A. Lacobelle,* for the appellant-appellee (named defendant).

*William F. Gallagher,* with whom were *Alan Neigher* and, on the brief, *Hugh D. Hughes* and *Judith Trutt,* for the appellee-appellant (plaintiff).

*Opinion*

ZARELLA, J. In this certified appeal, the named defendant, Norwalk Hospital (hospital),[1] appeals, and the

---

[1] The plaintiff, Charles D. Gianetti, also named as defendants William F. Hughes and Horace A. Laffaye, the chairmen of the department of surgery of the hospital, E. J. Tracey, the chief of staff of the hospital, Joel Singer, the chief of the hospital's section of plastic and reconstructive surgery, and Norman A. Brady, the hospital president. The court, *Berdon, J.,* subsequently granted the plaintiff's motion to add, as additional defendants, physicians

plaintiff, Charles D. Gianetti, cross appeals from the judgment of the Appellate Court, which, inter alia, reversed the judgment of the trial court awarding the plaintiff nominal damages in connection with his breach of contract claim. The primary issue is whether the Appellate Court properly determined that the facts elicited at trial reasonably could only support the conclusion that the plaintiff was a lost volume seller of services and that he was entitled to damages for lost profits only for the year of 1984. We conclude that the record does not support that determination and, accordingly, we reverse in part the judgment of the Appellate Court and remand the case for a new hearing in damages.

The following facts and procedural history are relevant to the resolution of this appeal. The plaintiff is a physician who specializes in the field of plastic and reconstructive surgery. In 1974, the plaintiff was granted provisional clinical privileges as a member of the hospital's medical staff. In 1976, the plaintiff was granted full clinical privileges as an assistant attending staff physician. The plaintiff's privileges were renewed on an annual basis[2] through 1983. During this time period, the plaintiff also had clinical privileges at four other area hospitals.

In 1983, the last year for which the plaintiff was granted privileges, there were four plastic surgeons, including the plaintiff, who worked in conjunction with the hospital's emergency department. Neither the plaintiff nor the other plastic surgeons were required to remain physically at the hospital while "on call." Rather, they were summoned to the hospital as their services

Carmine Calabrese and Phillip F. Corso. Only the plaintiff and the hospital have participated in this appeal. In the interest of simplicity, the only defendant that we refer to throughout this opinion is the hospital.

[2] Privileges at the hospital are renewed on an annual basis, effective as of January 1. Physicians who have been granted privileges by the hospital are required to reapply annually for the renewal of privileges.

were needed. Three of the plastic surgeons who covered call at the hospital also simultaneously covered call at other area hospitals. Each plastic surgeon was responsible for billing his patient or the patient's medical insurance carrier for any services performed.

In 1983, the plaintiff applied for the renewal of privileges for 1984. On the basis of the recommendations of the hospital's department of surgery, section of plastic and reconstructive surgery and credentials committee, the medical staff of the hospital declined to renew the plaintiff's privileges for 1984. The hospital's board of trustees subsequently ratified the decision of the medical staff.

In 1984, a year in which the plaintiff derived no income from services performed at the hospital owing to the nonrenewal of his privileges, the plaintiff's gross income was $225,815. In 1983, the plaintiff earned $43,687 in gross income from services performed at the hospital and $172,890 in gross income from all other services performed, including services performed at other hospitals, for a total gross income of $216,577.

In response to the nonrenewal of privileges, the plaintiff brought the present action against the hospital in December, 1983, seeking, inter alia, damages and injunctive relief. The case thereafter was referred to an attorney trial referee, who concluded in his report that an enforceable contract existed between the hospital and the plaintiff and, furthermore, that the hospital, through its employees and agents, had breached that contract by failing to follow the procedural requirements of its bylaws in declining to renew the plaintiff's privileges.[3]

---

[3] "The [hospital] objected to the acceptance of the [referee's] report, whereupon the parties agreed to reserve [certain] questions of law for appellate review, which [this court] decided in *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 557 A.2d 1249 (1989).

"In *Gianetti*, [this court] held [inter alia] that the bylaws of the hospital did not create a contract between the plaintiff and the . . . hospital but

The trial court subsequently accepted the referee's report and rendered judgment in favor of the plaintiff on the issue of liability. The trial court then conducted a hearing to determine the appropriate remedy, after which the court declined to grant the plaintiff injunctive relief because he did not prove that he had suffered irreparable harm or that he was without an adequate remedy at law. In addition, the court awarded the plaintiff $1 as nominal damages, reasoning that the evidence adduced by the plaintiff did not provide a basis for finding any economic loss or damages arising out of the hospital's breach of contract. The court based its award of nominal damages on its determination that the plaintiff was not a lost volume seller inasmuch as he provided personal services to the hospital and that, consequently, the doctrine of mitigation of damages applied. Thus, the court rendered judgment awarding the plaintiff nominal damages only.

The plaintiff thereafter appealed to the Appellate Court. The Appellate Court affirmed the trial court's denial of injunctive relief but reversed that part of the judgment awarding nominal damages. *Gianetti* v. *Norwalk Hospital*, 64 Conn. App. 218, 233, 779 A.2d 847 (2001). The Appellate Court concluded that the lost volume seller theory can apply to personal service contracts such as the one between the plaintiff and the hospital; see id., 226, 230;[4] and that, in light of the evi-

that there was, nevertheless, a contractual relationship between the hospital and the plaintiff. '[T]he medical staff bylaws, per se, do not create a contractual relationship between the hospital and the plaintiff but because of the undertakings of the plaintiff and the hospital and because the hospital has a duty to obey its bylaws, the bylaws have now become "an enforceable *part* of the contract" between the hospital and this physician to whom it has given privileges at the hospital.' " (Emphasis in original.) *Gianetti* v. *Norwalk Hospital*, 64 Conn. App. 218, 220–21, 779 A.2d 847 (2001).

[4] The Appellate Court rejected the trial court's conclusion that our decision in *McMahon* v. *Bryant Electric Co.*, 121 Conn. 397, 185 A. 181 (1936), counsels against the application of the lost volume seller theory to personal service contracts. See *Gianetti* v. *Norwalk Hospital*, supra, 64 Conn. App. 223, 226.

dence contained in the record, the trial court should have deemed the plaintiff a lost volume seller and should have awarded him damages equal to his lost profits in 1984 only.[5] Id., 231. Thus, the Appellate Court remanded the case to the trial court for a new hearing in damages with guidance on the appropriate method of calculating damages. See id., 233.

We thereafter granted the hospital's petition for certification to appeal limited to two issues. First, "[d]id the

We agree with the Appellate Court that the trial court erroneously interpreted our decision in *McMahon*.

In *McMahon*, we held that the trial court properly declined to instruct the jury on the doctrine of mitigation of damages in a case involving an alleged breach of contract for the sale and delivery of merchandise. *McMahon* v. *Bryant Electric Co.*, supra, 121 Conn. 408. We noted that mitigation principles are applicable "to actions seeking recovery for deprivation of a contract for personal services for a determinate period, as distinguished from one for the performance of specific work or the accomplishment of a specific purpose under which the contractor may either do the work in person or by his servants or others or, perhaps, sublet it to a stranger." Id., 406–407. In *McMahon*, we also noted that, because the contract required "the plaintiff's specialized experience and ability . . . it might savor of a contract for personal services rather than one under which it was immaterial by whom the work was done so long as the units contracted for were produced and delivered." Id., 407–408. We concluded, however, that "the defendant was not entitled to have [the mitigation instruction] given unless and until it had offered evidence that the plaintiff was, or by proper diligence could have been, otherwise gainfully employed during the time which it would have been necessary for him to have [performed the contract that allegedly was breached]." Id., 408. Thus, inasmuch as the defendant did not proffer such evidence, the trial court was under no obligation to instruct the jury on the doctrine of mitigation of damages. See id.

It is clear, therefore, that, in *McMahon*, we only were concerned with whether mitigation principles applied under the facts rather than with limiting the application of what is now known as the lost volume seller theory. Accordingly, we agree with the Appellate Court that *McMahon* cannot be interpreted to prohibit the application of the lost volume seller theory to cases involving a breach of contract for personal services.

[5] The Appellate Court adopted a three-prong test for determining whether a seller qualifies as a lost volume seller. The seller must establish: (1) the capacity to make an additional sale; (2) that it would have been profitable to make an additional sale; and (3) that it probably would have made an additional sale in the absence of the buyer's breach. *Gianetti* v. *Norwalk*

Appellate Court properly conclude that the plaintiff was a lost volume seller?" (Internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, 258 Conn. 945, 788 A.2d 95 (2001). Second, "[d]id the Appellate Court properly conclude that the plaintiff was not required to mitigate damages . . . and that he was entitled to more than nominal damages?" Id., 946. We also granted the plaintiff's petition for certification to cross appeal limited to the following issue: "Did the Appellate Court properly conclude that, on the remand, the plaintiff was entitled to prove damages for only one year?" *Gianetti* v. *Norwalk Hospital*, 258 Conn. 946, 788 A.2d 95 (2001). This appeal and cross appeal followed.

I

We begin with the hospital's first claim, namely, that the Appellate Court improperly determined that the plaintiff was a lost volume seller as a matter of law. The hospital essentially makes two arguments in support of this claim. First, although the hospital does not challenge the Appellate Court's legal conclusion that the lost volume seller theory may apply to contracts for personal services, such as the one between the hospital and the plaintiff, it does contend that the Appellate Court improperly concluded that the plaintiff was a lost volume seller. In particular, the hospital asserts that the Appellate Court improperly declined to credit the trial court's factual finding that the plaintiff would have been unable to perform under the contract with the hospital while simultaneously performing under the contracts with the other hospitals after the hospital had declined to renew his privileges. Accordingly, the hospital requests that we reverse the judgment of the Appellate Court and reinstate the trial court's award of nominal damages on the basis of that court's factual

_____

*Hospital*, supra, 64 Conn. App. 227. We discuss the lost volume seller theory in detail later in this opinion.

findings. Alternatively, the hospital requests that we reverse the judgment of the Appellate Court insofar as that judgment depends on that court's conclusion that the plaintiff was a lost volume seller as a matter of law, and remand the case to the trial court for reconsideration of the facts under the lost volume seller theory.

We conclude that the record does not support the hospital's assertion that the plaintiff was not a lost volume seller on the basis of the trial court's factual findings. We also conclude that the record does not support the Appellate Court's determination that the facts were sufficient to conclude that the plaintiff was a lost volume seller as a matter of law. Accordingly, we reject the Appellate Court's conclusion that the plaintiff was a lost volume seller as a matter of law and agree with the hospital's alternative claim that the proper remedy in this instance is to remand the case for a new hearing to afford the trial court an opportunity to determine whether the plaintiff was a lost volume seller under the circumstances of this case.

We begin our analysis with a brief discussion of the lost volume seller theory. Comment (f) to § 347 of the Restatement (Second) of Contracts provides that, in cases in which a contract has been breached, if there is a factual finding that an "injured party could and would have entered into the subsequent contract, even if the [underlying] contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract." 3 Restatement (Second), Contracts § 347, comment (f), p. 117 (1981). Thus, "[t]he lost volume seller theory allows [for the] recovery of lost profits despite resale of the services that were the subject of the terminated contract if the seller . . . can prove that he would have entered into both transactions but for the breach." *Green Tree Financial Corp.* v. *Alltel Information Services, Inc.*,

Civ. No. 02-627 (JRT/FLN), 2002 U.S. Dist. LEXIS 18764, *25–*26 (D. Minn. September 26, 2002). Although the lost volume seller theory is commonly understood to apply to contracts involving the sale of goods,[6] it applies with equal force to contracts involving the performance of personal services such as employment contracts. 22 Am. Jur. 2d 592, Damages § 509 (1988).

To qualify as a lost volume seller, a party must prove that the subsequent contract is not a substitute for the opportunity that has been lost as a result of the breach. See 3 Restatement (Second), supra, § 350, comment (d), p. 129. "A 'substitute' is a contract which a volume seller who has suffered the loss of one contract through the breach of another party has entered into in place of the broken contract and which the volume seller would not have been able, with his existing personnel and overhead costs, to perform had there been no breach." *Katz Communications, Inc.* v. *Evening News Assn.*, 705 F.2d 20, 23 n.1 (2d Cir. 1983).

Therefore, "a party claiming to be a lost volume seller must establish that it would have had the benefit of both the original contract and the subsequent contracts had there not been a breach. . . . This test has both objective and subjective components." (Citations omitted.) *Ullman-Briggs, Inc.* v. *Salton, Inc.*, 754 F. Sup. 1003, 1008 (S.D.N.Y. 1991). Specifically, "to recover lost

---

[6] Subsection (2) of § 2-708 of the Uniform Commercial Code embodies the lost volume seller theory in the context of contracts for the sale of goods. Section 2-708 (2) provides: "If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." U.C.C. § 2-708 (2), 1B U.L.A. 265 (1989).

Section 2-708 (2) is codified with technical variation only at General Statutes § 42a-2-708 (2).

profits under [the lost volume seller] theory, a [non-breaching] party must prove three things: [1] that the seller of services had the capability to perform both contracts simultaneously; [2] that the second contract would have been profitable; and [3] that the seller of services probably would have entered into the second contract even if the first contract had not terminated." *Green Tree Financial Corp.* v. *Alltel Information Services, Inc.*, supra, 2002 U.S. Dist. LEXIS *26; see also *R.E. Davis Chemical Corp.* v. *Diasonics, Inc.*, 924 F.2d 709, 711 (7th Cir. 1991).

We now adopt[7] the foregoing three-pronged test for determining whether a provider of services may qualify as a lost volume seller. Accordingly, we address the issues in this case with this legal framework in mind.

A

The hospital claims that the Appellate Court improperly declined to credit the trial court's factual findings. As we previously have noted, the hospital does not challenge the Appellate Court's conclusion that the lost volume seller theory may apply, under appropriate circumstances, to contracts for personal services. The hospital argues, however, that, notwithstanding the trial court's erroneous rejection of the applicability of the lost volume seller theory to personal service contracts, the court's factual finding regarding the plaintiff's lack of capacity to perform under the contract with the hospital while simultaneously assuming an increased workload at the other hospitals at which the plaintiff had privileges not only does not support the Appellate Court's conclusion that the plaintiff was a lost volume seller, but demonstrates that the plaintiff was, in fact, not a lost volume seller. The plaintiff counters that, in

---

[7] The Appellate Court adopted a test identical in all material respects in the present case. See *Gianetti* v. *Norwalk Hospital*, supra, 64 Conn. App. 227, and footnote 5 of this opinion.

making such a factual finding, the trial court erroneously focused on the plaintiff's income rather than the number of procedures he had performed. We conclude that the trial court's decision does not support the hospital's contention.

According to the hospital, two specific parts of the trial court's memorandum of decision resolve the capacity issue. First, the hospital claims that the trial court's statement, "[t]his [was] not a 'lost volume seller' theory of damage[s] case [in which] the [plaintiff] had enough capacity to have fully performed the contract as well as his . . . other business," is dispositive of the factual issue of whether the plaintiff was a lost volume seller. We disagree.

This statement, when read out of context, strongly supports the hospital's position. When the statement is read in the context of the trial court's entire memorandum of decision, however, it is clear that the statement does not dispose of the capacity issue.

The trial court stated in its memorandum of decision: "This is not a 'lost volume seller' theory of damage[s] case [in which] the [plaintiff] had enough capacity to have fully performed the contract as well as his . . . other business. See *McMahon* v. *Bryant Electric Co.*, 121 Conn. 397, [407–408, 185 A. 181] (1936). [The court in] [t]hat case, which adopted the lost volume theory, specifically stated [that] it would not apply to contracts for personal services. The logic of this distinction is obvious. If a contract employee is terminated in breach of his contract with his employer and remains unemployed at no fault of his [own] for the term of his contract, the measure of damages is clear and simple. He would be entitled to the benefit of his bargain and be placed in the same position [in which] he would have been . . . if the contract had been performed. On the other hand, if the terminated employee immediately

finds a suitable position at the same or higher compensation, the result would be different."

We first note that the trial court made this statement on the basis of its interpretation of our decision in *McMahon* v. *Bryant Electric Co.*, supra, 121 Conn. 397. Thus, it is clear that the statement regarding the plaintiff's capacity was made as part of a legal determination rather than as a factual finding. In fact, in the very next sentence after making what the hospital characterizes as a factual finding regarding the plaintiff's capacity to work, the trial court stated that the lost volume seller theory does not apply, as a matter of law, to personal service contracts. Thus, the court had no occasion to determine whether the plaintiff qualified as a lost volume seller in light of its conclusion that this theory did not apply, as a matter of law, to cases involving a breach of contract for personal services. Thus, we reject the hospital's contention that the Appellate Court improperly declined to credit the foregoing statement as a dispositive factual finding.

The hospital also contends that the portion of the trial court's memorandum of decision in which the court examines the gross income models offered by the plaintiff in support of his claim of damages also contains dispositive factual findings regarding the plaintiff's lack of capacity to perform under the contract with the hospital while simultaneously assuming an increased workload at the other hospitals. Specifically, the hospital refers to that portion of the trial court's memorandum of decision in which the court, after having reviewed the plaintiff's gross income models, states that it "must . . . test the reasonableness of the conclusions raised in [certain of the gross income models]. . . . [T]hose [models] merely took a particular percentage based on past history of . . . income [earned at the hospital] as it compared to gross income and came up with the projected figure for 'lost' . . . income. It did not factor

in . . . any way the plaintiff's ability or capacity to follow cases [at the hospital] or whether the level of income projected for future . . . income [at the hospital] was even available. It simply said that despite how high the . . . income [earned at the other hospitals] increased in the future, it would apply a certain past percentage to determine future . . . income [to be earned at the hospital]. This approach the court finds to be unreasonable, lacking in certainty and based on the assumption that no matter how busy the plaintiff became in [working at the other hospitals] he could be available for an increase in [work at the hospital]. Although the plaintiff claimed [that] he could have handled all the additional work (if in fact it was available), the court does not find that credible or reasonable."

According to the hospital, "[t]he Appellate Court failed to give [the foregoing] finding[s] as to 'capacity' the proper weight and credit which [they] deserved in support of the trial court's [decision]." The hospital argues, therefore, that the trial court's findings regarding the plaintiff's capacity to work support its contention that the plaintiff was not a lost volume seller. We disagree.

We note that, in this portion of the trial court's memorandum of decision, the trial court alludes to the plaintiff's capacity to work after evaluating certain income models through which the plaintiff's expert analyzes the plaintiff's projected gross income over a period of fifteen years commencing on the date of the breach. The assumption underlying these models is that the plaintiff had an unlimited capacity to work during this time period. As we previously have noted, the trial court found that this proposition was not reasonable or credible. In our view, because the models purport to gauge actual damages for fifteen years, and the testimony of the plaintiff's expert supported the plaintiff's claim concerning projected damages for an additional ten

years, the trial court's rejection of the plaintiff's claim as unreasonable and not credible is better understood as an assessment of the plaintiff's capacity over the entire twenty-five year period. Therefore, in assessing the plaintiff's capacity to work, the trial court was considering an extended period of time spanning twenty-five years rather than any shorter time period such as the year after the breach. Had the trial court limited its analysis to a shorter time period, we cannot be sure that it would have reached the same conclusion. For example, the plaintiff may have been a lost volume seller in 1984, but may have failed to qualify as a lost volume seller in any subsequent year. In fact, the evidence presented at the hearing as to the number of procedures the plaintiff had performed prior to and the year after the date of breach indicated that the plaintiff's workload had increased the year following the breach but steadily had declined thereafter.

Thus, although the trial court's rejection of the plaintiff's contention that he possessed the capacity to perform under the contract with the hospital while assuming an increased workload at the other hospitals may have been valid with regard to the fifteen year period following the breach, that rejection was not necessarily valid with respect to shorter time periods. Accordingly, we reject the hospital's contention that the trial court's factual finding regarding the plaintiff's capacity to work compelled the Appellate Court to conclude that the plaintiff was not a lost volume seller.

There is an additional reason why we reject the hospital's claim that the trial court's factual finding regarding the plaintiff's capacity to work provided a sufficient basis to conclude that the plaintiff was not a lost volume seller. As the plaintiff notes, the trial court only was concerned with whether the plaintiff had mitigated his damages and, consequently, focused its analysis on the plaintiff's gross income rather than the number of medi-

cal and surgical procedures he had performed. In the present case, a primary issue in determining the plaintiff's damages is whether, after the hospital had declined to renew the plaintiff's privileges, the plaintiff could have performed the number of procedures he typically had performed under the contract with the hospital while simultaneously increasing the number of procedures he performed at the other hospitals. See *Katz Communications, Inc.* v. *Evening News Assn.*, supra, 705 F.2d 26 (considering specific type of work required under contract in determining plaintiff's status as lost volume seller of personal services); *Lone Star Ford, Inc.* v. *McCormick*, 838 S.W.2d 734, 740 (Tex. App. 1992) (same). Although the gross income models may be relevant to the capacity issue, we do not believe that the mere fact that the plaintiff's gross income increased the year following the breach adequately resolves the issue of whether the plaintiff had possessed the capacity to perform under the contract with the hospital while simultaneously assuming an increased workload at the other hospitals.[8] Accordingly, because the trial court did not address the limited issue of whether, in 1984, and each individual year thereafter, the plaintiff had possessed the capacity to perform under the contract with the hospital while simultaneously assuming an increased workload at the other hospitals, and because the court focused on the plaintiff's gross income rather than the number of procedures the plaintiff could have performed, we reject the hospital's contention that the trial court's decision contains dispositive factual findings on the issue of the plaintiff's capacity to work.

B

Having determined that the trial court's factual findings did not establish that the plaintiff was not a lost

[8] The plaintiff testified that his increase in gross income in the years following the hospital's breach was due in large part to the increase in fees earned in connection with the performance of each surgical or medical procedure.

volume seller, we next address the hospital's alternative argument, namely, that the record in this case, nonetheless, does not support the Appellate Court's conclusion that the plaintiff was a lost volume seller as a matter of law. The Appellate Court concluded that "the uncontroverted facts were that the plaintiff had the capacity to enter into other contracts with other hospitals simultaneously with his contract with the defendant hospital, that it was profitable for him to do so and that he would have made such additional sales of his services in the future, whether or not the hospital breached its contract with him." *Gianetti* v. *Norwalk Hospital*, supra, 64 Conn. App. 229. On the basis of our review of the record, we agree with the hospital that the Appellate Court improperly concluded that the plaintiff was a lost volume seller as a matter of law.

The determination of whether a party qualifies as a lost volume seller involves questions "of fact to be resolved according to the circumstances of each case." 3 Restatement (Second), supra, § 347, comment (f), p. 117. "Ordinarily it is not the function of this court or the Appellate Court to make factual findings, but rather to decide whether the decision of the trial court was clearly erroneous in light of the evidence . . . in the whole record. . . . Conclusions of fact may be drawn on appeal only where the subordinate facts found [by the trial court] make such a conclusion inevitable as a matter of law . . . or where the undisputed facts or uncontroverted evidence and testimony in the record make the factual conclusion so obvious as to be inherent in the trial court's decision." (Citations omitted; internal quotation marks omitted.) *State* v. *Reagan*, 209 Conn. 1, 8–9, 546 A.2d 839 (1988).

We are mindful of the general rule that, in drawing factual conclusions, "the trial court has discretion to reject even uncontested evidence, on the theory that the fact finder is uniquely well situated to make determi-

nations of witness credibility." *Willow Funding Co., L.P.* v. *Grencom Associates,* 246 Conn. 615, 623, 717 A.2d 1211 (1998). An exception exists, however, when "the evidence [is] uncontroverted and overwhelming . . . ." Id. Under such circumstances, "the trial court [is] not free to disregard undisputed, probative evidence." Id. Thus, a reviewing court can draw its own factual conclusions, notwithstanding any contrary factual findings made by the trial court, when the record renders such conclusions inevitable as a matter of law. See id. In the present case, we conclude that the limited evidence in the record concerning the plaintiff's capacity and intent to perform under the contract with the hospital while simultaneously assuming an increased workload at the other hospitals is neither uncontroverted nor sufficiently clear as to warrant the conclusion that the plaintiff is a lost volume seller as a matter of law.

We begin with the capacity issue. The issue of whether the nonbreaching party possessed the requisite capacity to perform under multiple contracts simultaneously is one of fact for the trier; e.g., *Rubin* v. *Schwartz,* 191 App. Div. 2d 171, 172, 594 N.Y.S.2d 193 (1993); and not one, therefore, that can be made on appeal, unless the evidence in the record renders the conclusion inevitable as a matter of law. See *Papcun* v. *Papcun,* 181 Conn. 618, 621, 436 A.2d 282 (1980). We note, however, that the only evidence relevant to the capacity issue contained in the record is the plaintiff's own testimony. The plaintiff testified as to the number of procedures that he had performed both prior and subsequent to the breach and also testified as to his ability to perform under the contract with the hospital postbreach while assuming an increased workload at the other hospitals. The plaintiff further testified that it was feasible to work out of three or four hospitals simultaneously. The gross income models that the plaintiff offered, however, were not definitive on the capacity issue inasmuch as they

merely assumed that the plaintiff possessed the capacity to perform an increased workload. Thus, although it appears from the plaintiff's testimony that he had the capacity to perform an increased number of procedures, we cannot make this determination on the basis of the present record. As we have stated, "[i]t is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Leo* v. *Leo*, 197 Conn. 1, 4, 495 A.2d 704 (1985). Thus, whether the plaintiff's testimony should be credited in this instance is an issue for the trial court to determine.[9] See *Bieluch* v. *Bieluch*, 199 Conn. 550, 555, 509 A.2d 8 (1986) ("[t]he trial court is not bound by the uncontradicted testimony of any witness"). Accordingly, without more, we cannot conclude that the plaintiff's testimony constituted overwhelming and uncontroverted evidence of his capacity to perform under the contract with the hospital while assuming an increased workload at the other hospitals, even in 1984, as the Appellate Court has determined.

In addition, the Appellate Court concluded that the plaintiff actually intended to make "additional sales of his services in the future, whether or not the hospital breached its contract with him." *Gianetti* v. *Norwalk Hospital*, supra, 64 Conn. App. 229. We disagree. We note that the trial court, in analyzing this case under mitigation principles, failed to address the issue of whether the plaintiff would have sought to perform additional procedures at the other hospitals if the hospital had not declined to renew his privileges. The trial court did find, however, on the basis of the gross income

---

[9] We note, however, that, in part I A of this opinion, we rejected the hospital's contention that the trial court's finding that the plaintiff's testimony regarding his capacity to work over a twenty-five year period lacked credibility compelled the conclusion that the plaintiff did not qualify as a lost volume seller.

models provided by the plaintiff, that the plaintiff was able to increase his workload at the other hospitals after the hospital had declined to renew his privileges. Testimony adduced at the hearing in damages confirmed this correlation. This finding may suggest a lack of intent on the part of the plaintiff to do anything other than maintain the level of business that he had maintained prior to the hospital's nonrenewal of privileges. On the other hand, the plaintiff claimed that he continuously had sought the hospital's reinstatement of privileges. The plaintiff further testified that, had the hospital renewed his privileges, he would have experienced the same increase in earnings at the other hospitals as he did each year after the breach. This testimony may suggest that the plaintiff had intended to increase his workload at the other hospitals even if the hospital had opted to renew his privileges. Although we believe that a fact finder, viewing the evidence in its entirety, reasonably may have inferred that such intent existed, we conclude that evidence in the record regarding the plaintiff's intent was not uncontroverted.

We conclude that, on the present state of the record, the Appellate Court improperly determined, as a matter of law, that the plaintiff was a lost volume seller. Therefore, we agree with the hospital's alternative claim that this case should be remanded for a new hearing to afford the trial court an opportunity to determine whether the plaintiff qualifies as lost volume seller under the circumstances of this case.[10]

---

[10] We have not addressed the remaining prong of the lost volume seller test, namely, whether it would have been profitable for the plaintiff to have maintained his contract with the hospital while increasing his workload elsewhere. In the context of this case—one involving a contract for personal services—the relevant inquiry under the profitability prong is whether the plaintiff could have performed under the contract with the hospital and assumed the increased workload at the other hospitals the year after the breach without having incurred additional costs that would have eliminated the profitability of such an increased workload. See *Katz Communications, Inc.* v. *Evening News Assn.*, supra, 705 F.2d 26. As we previously have noted, the plaintiff presented evidence at the hearing in damages demonstrating that

## II

We turn, therefore, to the next certified issue, namely, whether the plaintiff was required to mitigate damages. We note that resolution of the issue of whether the plaintiff was a lost volume seller directly controls the resolution of the issue of whether the plaintiff had a duty to mitigate damages. Thus, the trial court's determination on remand as to whether the plaintiff was a lost volume seller will resolve the issue of whether the plaintiff had a duty to mitigate.

We recognize that "[t]he obligation to mitigate damages turns upon the particular facts in the individual case, and applies when the . . . contractor is freed from his or her obligation to perform services called for in the contract, and as a consequence may turn his or her time and efforts, which otherwise would have been expended in performance of the contract, to other

---

he could have performed under the contract with the hospital profitably while serving several other hospitals. Furthermore, there was no evidence that, as the plaintiff performed more medical and surgical procedures, the corresponding costs eventually would eliminate the profitability of such work. See 3 Restatement (Second), supra, § 347, comment (f), p. 117 ("[I]t is possible that an additional transaction would not have been profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach. It is sometimes assumed that he would have done so, but the question is one of fact to be resolved according to the circumstances of each case."); cf. *R.E. Davis Chemical Corp.* v. *Diasonics, Inc.*, 826 F.2d 678, 684 (7th Cir. 1987) ("as a seller's volume increases . . . a point will inevitably be reached where the cost of selling each additional item diminishes the incremental return to the seller and eventually makes it entirely unprofitable to conclude the next sale" [internal quotation marks omitted]). Although the trial court correctly may have observed that the plaintiff's work for the hospital was not as profitable as it was at some of the other hospitals, testimony adduced at the hearing in damages, as well as the reasonable inferences that can be drawn therefrom, supports the claim that it would have been profitable for the plaintiff to continue working for the hospital while increasing his workload elsewhere. Thus, the record supports the Appellate Court's conclusion that it would have been profitable for the plaintiff to perform under the contract with the hospital while assuming an increased workload at the other hospitals. See *Gianetti* v. *Norwalk Hospital*, supra, 64 Conn. App. 229.

remunerative [contracts]." *Rubin* v. *Schwartz*, supra, 191 App. Div. 171–72. Consistent with this principle, we have held that "[t]he normal rule on an employment contract is that when the employee is prevented from fully performing because the employer wrongfully fires him, the employee can recover the wages he would have earned under the contract, minus any wages which he has earned or could have earned elsewhere . . . ." (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 32–33, 662 A.2d 89 (1995). We acknowledge, however, that, in situations involving a lost volume seller, the application of mitigation principles in the calculation of damages for breach of contract does not provide the nonbreaching party with adequate compensation.[11] "[B]y definition, a lost volume seller cannot mitigate damages through resale. Resale does not reduce a lost volume seller's damages because the breach has still resulted in its losing one sale and a corresponding profit." *R.E. Davis Chemical Corp.* v. *Diasonics, Inc.*, 826 F.2d 678, 682–83 n.7 (7th Cir. 1987).

Indeed, "[t]he lost volume seller theory is a response to a breaching [party's] right to have a non-breaching seller [of services] mitigate damages. In other words, [the] seller can avoid the effect of its failure to mitigate by proving that it was a lost volume seller." *Storage Technology Corp.* v. *Trust Co. of New Jersey*, 842 F.2d 54, 57 (3d Cir. 1988). Thus, the only way to determine whether the plaintiff had a duty to mitigate, under the circumstances of the present case, is to first determine whether the plaintiff was a lost volume seller. As we already have noted, the trial court did not make such a

---

[11] "The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 32.

determination, and, consequently, we cannot determine whether the plaintiff had a duty to mitigate.

## III

We turn, finally, to the plaintiff's cross appeal. On cross appeal, the plaintiff claims that the Appellate Court improperly concluded that he was entitled to prove damages for only one year, namely, 1984. The plaintiff claims that, although the Appellate Court properly concluded that he was a lost volume seller, that court improperly made a factual determination regarding the length of the contract between the plaintiff and the hospital, thereby limiting the plaintiff's recoverable profits to one year. The plaintiff cites to the hospital's bylaws, which previously had been determined to form an integral part of the contract between the plaintiff and the hospital; see *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 64, 557 A.2d 1249 (1989); in support of his claim that his contract with the hospital "[was] not an annual contract but rather a tenured position, terminable only for cause, and reviewed annually." The Appellate Court concluded to the contrary, holding that "[t]he plaintiff had a personal services contract for 1983, probably renewable for another year, 1984, not a twenty-five year annuity for his working personal services life." *Gianetti* v. *Norwalk Hospital*, supra, 64 Conn. App. 231. The Appellate Court reasoned that, "at the end of 1983, if the plaintiff had been allowed to continue as a staff member of the . . . hospital it would have been for one year. The term of each of his contracts was for one year and any breach of a contract could, as a maximum, only involve one year." Id., 230. Accordingly, the Appellate Court concluded that the plaintiff's damages should encompass lost profits for only one year, namely, 1984. Id., 231. We agree with the plaintiff that the Appellate Court improperly concluded that he was entitled to recover damages for his lost profits for 1984 only.

We begin with a brief overview of the hospital's bylaws.[12] Pursuant to those bylaws, the renewal of privi-

[12] Article V, § 3, of the Norwalk Hospital Medical Staff Bylaws (1981) provides in relevant part:

"a. At least forty (40) days prior to each annual meeting of the medical staff, the credentials committee shall complete its review of all pertinent information available on each medical staff member for the purpose of determining its recommendations for reappointments to and promotions in the medical staff and for the delineation of clinical privileges for the ensuing calendar year. . . .

"b. Each recommendation concerning the reappointment or promotion of a medical staff member and the clinical privileges to be granted upon reappointment or promotion shall be based upon such member's professional competence and clinical judgment in the treatment of patients, his ethics and conduct, his attendance at medical staff meetings, his participation in departmental and staff affairs, documentation of continuing medical education, and the performance of committee assignments. At least forty (40) days prior to each annual meeting of the medical staff, the credentials committee shall make written recommendations to the departments, the executive committee and the medical staff concerning the reappointment or promotion of each member of the medical staff, including the specific clinical privileges to be granted to each reappointee for the ensuing calendar year.

"c. At least fifteen (15) days prior to the final scheduled board of trustees meeting in the medical staff year, the medical staff shall make written recommendations to the board of trustees . . . concerning the reappointment or promotions of each member of the medical staff, including the specific privileges to be granted to each reappointee for the ensuing calendar year. Where non-reappointment or a change in clinical privileges is recommended, the reasons for such recommendation shall be stated. Thereafter the procedure provided in Section 2, of this Article V relating to recommendations on applicants for initial appointment shall be followed."

Article V, § 2, of the Norwalk Hospital Medical Staff Bylaws (1981) provides in relevant part:

"e. When the recommendation of the medical staff is adverse to the practitioner, either in respect to appointment or clinical privileges, the chief executive officer shall promptly so notify the practitioner by certified mail, return receipt requested. No such adverse recommendation shall be forwarded to the board of trustees until after the practitioner has exercised or has been deemed to have waived his rights to a hearing as provided in Article VIII of these bylaws.

"f. If, after the medical staff has considered the report and recommendations of the ad hoc hearing committee as appointed in Article VIII, Section 4 of these bylaws and . . . such recommendation continues to be adverse, the chief executive officer following notification in writing from the chief of staff, shall promptly so notify the practitioner by certified mail, return receipt requested. The chief executive officer shall also forward such recommendation and documentation to the board of trustees, but the board of

leges is determined on an annual basis and is based upon, inter alia, the recommendations of various committees. All recommendations to deny the renewal of privileges must be in writing and contain the reasons in support thereof. Any physician who is subject to an adverse recommendation must be notified of that recommendation by certified mail. The bylaws afford the physician the right to a hearing and appellate review of the adverse recommendation. In any case, a final decision to deny the renewal of privileges cannot be made until the physician has been notified of the adverse recommendation and either has exhausted or waived his rights to a hearing and appellate review.

On the basis of our review of the bylaws, we cannot conclude, as the Appellate Court did, that "[t]he term of each of [the plaintiff's] contracts was for one year and any breach . . . could, as a maximum, only involve one year." Id., 230. As we previously noted, the bylaws require written documentation of the reasons supporting the recommendation for the nonrenewal of privileges and, more importantly, provide the physician with an opportunity to appeal such recommendation. In other words, the plaintiff "had a right to reappointment until the governing authorities determined after a hearing conforming to the minimum requirements of procedural due process that he did not meet the reasonable standards of the hospital." (Internal quotation marks omitted.) *Hackethal* v. *Loma Linda Community Hospital Corp.*, 91 Cal. App. 3d 59, 66, 153 Cal. Rptr. 783 (1979). "The fact that review of this appointment is made mandatory on an annual . . . basis (through a

trustees shall not take any action thereon until after the practitioner has exercised or has been deemed to have waived his right to an appellate review as provided in Article VIII of these bylaws.

\* \* \*

"h. At its next regular meeting after all of the practitioner's rights under Article VIII have been exhausted or waived, the board of trustees shall act in the matter. . . ."

statutory requirement of reappointment at that interval, as determined by the hospital's bylaws) can by no means be said to render it probationary or tentative in effect." (Internal quotation marks omitted.) Id. Therefore, unless we are to assume that, in the years following the hospital's breach of contract, circumstances would have arisen supporting the nonrenewal of the plaintiff's privileges, it cannot be said that, "at the end of 1983, if the plaintiff had been allowed to continue as a staff member of the . . . hospital it would have been for one year." *Gianetti* v. *Norwalk Hospital,* supra, 64 Conn. App. 230.

Our review of the bylaws does not completely resolve the present issue, however. As this court already has concluded in an earlier decision in this matter, "the [hospital's] . . . bylaws, by themselves, do not constitute an enforceable contract between th[e] hospital and the plaintiff"; *Gianetti* v. *Norwalk Hospital,* supra, 211 Conn. 59; but, rather, form "an integral part of the contractual relationship . . . ." (Internal quotation marks omitted.) Id., 64. Before we can properly review the rights and duties arising out of this contractual relationship, it is essential to determine "[t]he intention of the parties manifested by their words and acts . . . ." (Internal quotation marks omitted.) *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 199, 520 A.2d 208 (1987), overruled in part on other grounds, *Curry* v. *Burns,* 225 Conn. 782, 786, 626 A.2d 719 (1993). Thus, before any determination can be made with respect to the amount of damages to which the plaintiff is entitled as a result of the hospital's breach, it first must be determined how long the parties reasonably expected the contractual relationship to extend. See *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford,* 248 Conn. 350, 356–57, 727 A.2d 1260 (1999) ("[t]he intention of the parties to a contract is to be determined from . . . [inter alia] the circumstances connected

with the transaction" [internal quotation marks omitted]). Such inquiry, "being a determination of the parties' intent, is a question of fact . . . ." (Internal quotation marks omitted.) Id., 357. The trial court made no determination, however, regarding this issue other than to suggest that the plaintiff reasonably could not have expected to have retained privileges at the hospital through 1998, nearly fifteen years after the breach. Furthermore, the record contains no other evidence pertaining to what expectations the parties may have had regarding the length of the contract. Thus, the limited record before us does not provide an adequate basis on which to determine whether the contractual relationship between the parties was intended to be renewable on an annual basis at the discretion of the hospital or whether it was intended to endure for an extended period of time. Thus, we conclude that the Appellate Court improperly determined that the plaintiff's damages should be limited to lost profits for 1984 only.

Accordingly, upon remand, in order to determine the appropriate time period for calculating the plaintiff's lost profits, the trial court must also determine how long the parties reasonably could have expected the contractual relationship to have continued. Of course, the party proving lost profits must comply with our well settled law that "such damages must be proved with reasonable certainty." *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 69, 717 A.2d 724 (1998). "Although we recognize that damages for lost profits may be difficult to prove with exactitude . . . the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those [lost] profits with reasonable certainty." (Citations omitted; internal quotation marks omitted.) Id., 69–70.

In sum, we conclude that the Appellate Court properly determined, as a matter of law, that the lost volume seller theory applies to personal services contracts. We disagree, however, with the Appellate Court's conclusion regarding the plaintiff's status as a lost volume seller under the circumstances of the case. The evidence in the record was inadequate for the purpose of determining whether the plaintiff had possessed the capacity and intent to perform under the contract with the hospital while simultaneously assuming an increased workload at the other hospitals. Accordingly, any conclusions derived from those facts that are relevant to the first and third prongs of the lost volume seller test were improper. In addition, we conclude that the Appellate Court improperly determined that the plaintiff was entitled to damages for lost profits in 1984 only. The proper remedy under these circumstances is to remand the case for a new hearing to afford the trial court an opportunity to determine damages with due consideration of the lost volume seller theory and to make factual findings to that end, after which a reviewing court properly can determine whether the trial court's factual findings and its conclusions concerning the amount of damages to which the plaintiff is entitled are supported by the record.

The judgment of the Appellate Court is affirmed insofar as it upholds the trial court's denial of injunctive relief. The judgment of the Appellate Court is otherwise reversed and the case is remanded to that court with direction to remand the case to the trial court for further proceedings according to law.

In this opinion the other justices concurred.